BENJAMIN KIMBALL *vs.* HARRIET A. WHITNEY.

SAME *vs.* MARY E. BATES.

Suffolk.    March 14, 1919. — June 25, 1919.

Present: RUGG, C. J., LORING, DE COURCY, PIERCE, & CARROLL, JJ.

*Trust,* Investments by trustee.    *Massachusetts Electric Companies.*

A trustee under a will, which, as to the trust funds, directs him to "keep the same safely and profitably invested in real or personal property, mortgage notes, bonds, stock or any such other conservative investments as in his discretion he may approve," is bound, as to investments, only to conduct himself faithfully and to exercise a sound discretion: to observe how men of prudence, discretion and intelligence manage their own affairs, not in regard to speculation, but in regard to the permanent disposition of their funds, considering the probable income as well as the probable safety of the capital to be invested.

A trustee under the will above described invested trust funds in thirty so called preferred shares of the "Massachusetts Electric Companies" in 1903 and retained them until 1917, when he filed his first account. Upon a hearing, on an appeal from a decree of the Probate Court allowing an account which included such investment, the following facts appeared: "Massachusetts Electric Companies" was the business title of trustees under an agreement and declaration of trust under the provisions of which there was placed in the hands of the trustees a large and controlling majority of the capital stock of thirty-six street railway and electric light corporations in Massachusetts, Rhode Island and New Hampshire, operating mainly in Massachusetts, the business of the trustees being the holding of the stock of the subsidiaries and the supervising of their management by means of stock control and assisting in their financing. The trustees issued to the original subscribers to the agreement and declaration of trust negotiable certificates of "preferred" and "common" shares of the par value of $100 each, and it was provided that they should

not issue more shares, except that, upon vote of two thirds of the shareholders, further shares might be issued for the acquiring of further property for the trust. The trustees were elected by the shareholders from time to time and were given exclusive power to manage and control the properties in their hands, holding the shareholders harmless for their acts to the extent of the property of the trust but not personally, and not being liable for acts done in good faith or for errors of judgment or acts of their agents. The trustees were given no power to bind the shareholders personally, and all their contracts were so to stipulate. At the termination of the trust, the property was to be liquidated and divided among the shareholders, priority being given to the holders of preferred shares. The holders of preferred shares were entitled to a cumulative semiannual dividend at the rate of four per cent. In making the investment in question, the trustee acted in good faith. Previous thereto a large number of trustees in Massachusetts had invested in shares of the same security and were retaining their investments. Before investing, the trustee made reasonable inquiry among bankers and brokers and received favorable opinions of the investment. He paid $88.75 per share. Regular dividends on the shares at the rate of four per cent were paid to and including July 1, 1904; no more were paid until January 1, 1909; after July 1, 1910, and up to July 1, 1917, dividends averaged two per cent per annum, an issue of a seventeen and three quarters per cent dividend being made in new preferred stock in 1912 to satisfy accumulated dividends. The market value of the shares fluctuated widely after 1911, never was equal to the price at which the trustee purchased, and in August, 1917, was not higher than $25 per share. It was agreed that, "except in so far as the propriety of retaining the investment was affected by the character of the organization in contemplation of law, there was nothing in the future outlook of the Massachusetts Electric Companies and its subsidiaries which required the trustee as a matter of sound discretion to dispose of the shares." Upon a report and reservation by a single justice of the questions, whether the organization of the Massachusetts Electric Companies was such that the investment was proper as a matter of law or whether, if the original investment was proper, its retention was improper, it was *held*, that

(1) The reservation required a determination of the question, whether a finding that such investment was proper as a matter of fact must be pronounced wrong as matter of law;

(2) It could not be said that, at the time of the investment, it was improper and unwarranted as matter of law;

(3) It was not necessary to determine whether the agreement and declaration of trust constituted a partnership among the shareholders, or a trust;

(4) Assuming, without deciding, that a partnership among the shareholders was constituted by the agreement and declaration of trust, it was not a commercial or trading partnership, but a partnership of a peculiar kind, and its character did not as matter of law render the investment unwarranted;

(5) The facts showed that good faith and sound discretion were exercised in making the investment (following *Harvard College* v. *Amory*, 9 Pick. 446);

(6) The retention of the shares until August, 1917, could not be held as a matter of law to be unwarranted.

Two APPEALS by beneficiaries under a trust created by the will of Mary Bates, late of Boston, from a decree of the Probate Court

of the county of Suffolk allowing, with some amendments not material to this decision, the first account of the trustee, covering a period from March 6, 1892, to July 1, 1917.

Such of the objections of the appellants as are material to this decision were as follows:

"(1) That the court approved and allowed an investment in thirty shares of preferred stock of the Massachusetts Electric Companies, . . . which shares this appellant alleges were not a proper security for investment of the trust fund or of any part thereof.

"(2) That the court approved and allowed the retention of said shares by the trustee, [which still were in his hands when the account was filed] . . . , whereas this appellant alleges that the trustee had opportunities to dispose of said shares without loss, and that it was his duty to sell and dispose of the same."

The appeals were consolidated and were heard together by *De Courcy,* J., upon an agreed statement of facts.

The provision of the will of Mary Bates as to the investment of trust funds by the trustee was, "To keep the same safely and profitably invested in real or personal property, mortgage notes, bonds, stock or any such other conservative investments as in his discretion he may approve."

The thirty "preferred" shares of the Massachusetts Electric Companies in question were purchased by the trustee at $88.75 per share.

It appeared that the "Massachusetts Electric Companies" was formed by an agreement and declaration of trust whereby certain firms, designated "subscribers," who owned "certain shares of the capital stock and other securities of sundry street railway and other companies and contracts to purchase the same and also other property," conveyed the same to certain individuals as trustees, under the designation of "Massachusetts Electric Companies," the trustees issuing therefor negotiable certificates for two hundred and forty thousand shares of the par value of $100, of which one hundred and twenty thousand were designated preferred and one hundred and twenty thousand were designated common. Material provisions of the trust were as follows:

"Second. . . . The shareholders shall, at each annual meeting,

or adjournment thereof, elect five Trustees to serve for the term of three years next ensuing.  In case of the death, resignation, or inability to act of any of said Trustees, the remaining Trustees shall accept any resignation and fill any vacancy for the unexpired term.  As soon as any Trustees elected by the shareholders or by the remaining Trustees to fill a vacancy have accepted this trust, the trust estate shall vest in the new Trustees or Trustee, together with the continuing Trustees, without any further act or conveyance.

"Third.  The Trustees shall hold the legal title to all property at any time belonging to this trust, and shall have and exercise the exclusive management and control of the same; they shall assume all contracts for and obligations and liabilities in connection with or growing out of the purchase of the stock or securities assigned to them by the Subscribers and mentioned in the annexed schedule, and to the extent and value of such stock and securities but not personally shall agree to hold the Subscribers and any person associated or acting with them harmless and indemnified from and against any loss, cost, expense, or liability upon, by reason of, or in connection with, any such contract, obligation, or liability; they may adopt and use a common seal; they shall have power to vote in person or by proxy upon all shares of stock at any time belonging to the trust, and to collect, receive, and receipt for the dividends thereon, and may contract with each or any of the controlled companies in respect of any matter or matters relating to the operation of the road or the conduct of the business of any such company or companies; to collect, sue for, receive, and receipt for all sums of money at any time coming due to said trust; to employ counsel; to begin, prosecute, defend, and settle suits at law, in equity or otherwise, and to compromise or refer to arbitration any claims in favor of or against the trust; they may also, with the consent of not less than ten of their number given at a meeting called for that purpose, but not otherwise, exchange, upon such terms as may be agreed upon, the stock or securities held by them in any corporation for the stock or securities of any other corporation taking over the property of such corporation by consolidation or otherwise; and with such consent but not otherwise, may loan money to any corporations of which they may own a majority of the capital stock,

and may subscribe for or acquire additional stock or the securities or obligations of such corporations; and, with such consent but not otherwise, may subscribe for, purchase, and acquire shares in the capital stock or the securities of any corporations (1) owning or operating railways or railroads, or engaged in the business of transporting merchandise, mails, or express matter, or (2) engaged in whole or in part in supplying light, heat, power, or other public service, or (3) manufacturing, selling, or repairing machines, equipments, supplies, or other articles used by corporations of either or both of the classes above named, or (4) engaged in the business of insuring corporations of any or all of the foregoing classes against loss by fire or casualty, or (5) engaged in the business of advertising in the cars or upon the premises of railway or railroad companies; and with such consent but not otherwise, may borrow money for any of the purposes aforesaid. With the consent of the holders of at least two-thirds of each class of shares outstanding given at a meeting called for that purpose, but not otherwise, except as herein otherwise provided, the Trustees may sell, mortgage, pledge, encumber, or dispose of any shares of stock, securities, or other property from time to time held by them upon such terms and for such purposes as the shareholders at such meeting may approve. . . .

"Fourth. . . . The Trustees may make, adopt, amend, or repeal such by-laws, rules, and regulations, not inconsistent with the terms of this instrument, as they may deem necessary or desirable for the conduct of their business and for the government of themselves and their agents, servants and representatives.

"Fifth. The Trustees shall annually elect from among their number a President and a Vice-President of the Board, and shall also annually elect a Treasurer and a Secretary, and they shall have authority to appoint such other officers, agents, and attorneys as they may from time to time deem necessary or expedient for the conduct of their business. . . . The Trustees shall fix the compensation, if any, of all officers and agents whom thay may appoint, and are likewise authorized to pay to themselves such compensation for their own services as they may deem reasonable. The Trustees shall also appoint from among their number an Executive Committee of three or five persons, to whom they may delegate such of the powers herein conferred upon the Trustees

as they may deem expedient, except so far as those matters are concerned in which the concurrent action of at least ten Trustees is required.

"The Trustees shall not be liable for errors of judgment either in holding property originally conveyed to them or in acquiring and afterwards holding additional property, nor for any loss arising out of any investment, nor for any act or omission to act performed or omitted by them in the execution of this trust in good faith, nor shall they be liable for the acts or omissions of each other or of any officer, agent, or servant appointed by or acting for them, and they shall not be obliged to give any bond to secure the due performance of this trust by them.

"Sixth. Shares hereunder shall be of the par value of one hundred (100) dollars each, and shall be divided into preferred and common shares. The preferred shares shall entitle the holder to a cumulative semi-annual dividend at the rate of four per centum per annum, and no more, the same to be paid or set apart before any dividend shall be paid or set apart for the common shares; and in case of liquidation, the proceeds of the liquidation shall be first applied to the payment to the holders of preferred shares of the sum of one hundred dollars per share and any accrued and unpaid dividends thereon, and the balance remaining thereafter shall be divided among the holders of common shares in proportion to their holdings. . . .

"Seventh. . . . Except as aforesaid, [the exception not being material] no shares shall be issued by the Trustees in excess of the amount to be originally issued to the Subscribers, as hereinbefore stated; but the Trustees may, from time to time, for the purpose of providing means for the acquisition of additional property or otherwise accomplishing the purposes of this trust, with the consent of at least two-thirds of the preferred shareholders and two-thirds of the common shareholders, present and voting at any meeting called for that purpose, issue and dispose of additional shares upon such terms and in such manner as the shareholders at such meeting may determine. . . .

"Eighth. The Trustees may, from time to time, declare and pay dividends out of the net earnings from time to time received by them, but the amount of such dividends and the payment of them shall be wholly in the discretion of the Trustees; except

that the dividends on the preferred shares shall be payable semi-annually on the first days of June and December in each year, at the rate of four per. cent. per annum, and no more, and shall be cumulative, and said semiannual dividends shall be paid or set apart before any dividends are paid on the common shares.

"Ninth. . . . Annual meetings . . . shall be held in Boston, on the Wednesday following the first Monday of November, in each year. . . . Special meetings of the shareholders may be called at any time, upon seven days' notice, given as above stated, when ordered by the President or Trustees. At all meetings of the shareholders, each holder of shares, whether preferred or common, shall be entitled to one vote for each share held by him, and any shareholder may vote by proxy. . . . No business except to adjourn shall be transacted at any meeting of the shareholders unless the holders of a majority of all the shares outstanding are present in person or by proxy.

"Tenth. The death of a shareholder or Trustee during the continuance of this trust shall not operate to determine the trust, nor shall it entitle the legal representatives of the deceased shareholder to an accounting, or to take any action in the courts, or elsewhere, against the Trustees; but the executors, administrators, or assigns of any deceased shareholder shall succeed to the rights of said decedent under this trust, upon the surrender of the certificate for the shares owned by him.

"The ownership of shares hereunder shall not entitle the shareholders to any title in or to the trust property, whatsoever, or right to call for a partition or division of the same, or for an accounting.

"Eleventh. The Trustees shall have no power to bind the shareholders personally, and the Subscribers and their assigns and all persons or corporations extending credit to, contracting with, or having any claim against the Trustees shall look only to the funds and property of the trust for payment under such contract or claim, or for the payment of any debt, damage, judgment, or decree, or of any money that may otherwise become due or payable to them from the Trustees, so that neither the Trustees nor the shareholders, present or future, shall be personally liable therefor.

"In every written order, contract, or obligation which the Trustees shall give or enter into, it shall be the duty of the Trustees

to stipulate that neither the Trustees nor the shareholders shall be held to any personal liability under or by reason of such order, contract, or obligation.

"Twelfth. This trust shall continue for the term of twenty-one years, at which time the then Board of Trustees shall proceed to wind up its affairs, liquidate its assets, and distribute the same among the holders of preferred and common shares according to the priorities hereinbefore expressed; provided, however, that if prior to the expiration of said period, the holders of at least two-thirds of the shares then outstanding shall, at a meeting called for that purpose, vote to terminate or to continue this trust, then said trust shall either terminate or continue in existence for such further period as may then be determined. . . .

"This agreement and declaration of trust may be amended or altered except as regards the liabilities of the Trustees at any annual or special meeting of the shareholders with the consent of the holders of at least two-thirds of the shares of each class then outstanding; provided notice of the proposed amendment or alteration shall have been given in the call for the meeting; and in case of such alteration or amendment, the same shall be attached to and made a part of this agreement, and a copy thereof shall be filed with the Old Colony Trust Company."

A schedule showing market quotations of preferred shares of Massachusetts Electric Companies from 1900 to August, 1917, inclusive, was as follows:

|  | Low. | High. |  | Low. | High. |
|---|---|---|---|---|---|
| 1900 | $73\frac{1}{2}$ | 80 | 1910 | 75 | 88 |
| 1901 | 78 | $95\frac{7}{8}$ | 1911 | $83\frac{3}{4}$ | 96 |
| 1902 | $91\frac{3}{4}$ | $98\frac{1}{2}$ | 1912 | $72\frac{3}{8}$ | 84 |
| 1903 | $75\frac{1}{2}$ | 95 | 1913 | 64 | 79 |
| 1904 | $52\frac{3}{4}$ | $80\frac{1}{2}$ | 1914 | $43\frac{1}{2}$ | $66\frac{1}{2}$ |
| 1905 | $55\frac{1}{4}$ | $70\frac{1}{8}$ | 1915 | 33 | 55 |
| 1906 | $59\frac{1}{2}$ | 75 | 1916 | 26 | 44 |
| 1907 | 37 | $75\frac{1}{2}$ | 1917 | $20\frac{1}{2}$ | $29\frac{1}{2}$ |
| 1908 | $39\frac{1}{2}$ | 64 | August 1917 | $24\frac{1}{2}$ | 25 |
| 1909 | $58\frac{1}{2}$ | 84 |  |  |  |

Other material facts are stated in the opinion.

The single justice found and ruled "that the decree of the Pro-

bate Court allowing said account should be in all respects affirmed unless and except in so far as a determination in the affirmative of either of the questions herein reported may require a modification of them," and reported for determination by the full court the following questions:

"(1) Whether the organization of the Massachusetts Electric Companies was such on February 26, 1903, that the investment of any portion of the trust funds in its preferred shares was as a matter of law improper.

"(2) Whether, if the original investment of a portion of the trust fund in preferred shares of Massachusetts Electric Companies was not as a matter of law improper on February 26, 1903, the retention of the investment in said preferred shares, and the failure to sell said shares before the end of the period covered by the account, were as matter of law improper, in view of later decisions of the Supreme Judicial Court in respect to similar organizations."

The report stated: "If either of said questions is determined in the affirmative, or both, then the decree of the Probate Court is to be modified so far as the decision upon said questions requires, and in all other respects is to be affirmed. If both of said questions are determined in the negative, the decision of the Probate Court is to be affirmed."

*J. Noble,* for the appellants.

*J. G. Palfrey,* for the appellee.

RUGG, C. J. These are two appeals from a decree of the Probate Court allowing an account of a trustee under the will of Mary Bates. The matters now in controversy relate to certain aspects of the propriety of an investment made by the trustee in February, 1903, of a part of the principal of the trust in so called preferred shares of the Massachusetts Electric Companies at the market price then prevailing, and to the retention of this investment to the end of the period of the account in 1917. The case comes before us by report upon agreed facts.

The facts now pertinent to the decision are that the Massachusetts Electric Companies was an unincorporated association organized and existing under a written instrument entitled "Agreement and Declaration of Trust," dated in June, 1899. The general features of this agreement were similar to those which

have come before the court in numerous cases. Property is transferred to trustees, who hold the legal title to all the assets belonging to the trust and exercise the exclusive management and control of it under the terms of the agreement. Certificates of part ownership, resembling shares of stock·in a corporation, are issued to those who are the ultimate owners of the property. See *Peabody* v. *Treasurer & Receiver General,* 215 Mass. 129, and cases there collected, and *Kennedy* v. *Hodges,* 215 Mass. 112, 114.

The Massachusetts Electric Companies acquired all or a large and controlling majority of the capital stock of thirty-six street railway and electric light corporations in Massachusetts, Rhode Island and New Hampshire. "The companies were merged from ·time to time and in 1906 consisted of the Boston and Northern Street Railway Company, the Old Colony Street Railway Company, and the Hyde Park Electric Light Company. Prior to 1912 the stock of the Hyde Park Electric Light Company was sold and the two other companies were merged, and the name of the ·consolidated company was changed to the Bay State Street Railway Company, of which the Massachusetts Electric Companies owned substantially all the common stock, being a large and controlling majority of all the stock. The Massachusetts Electric Companies did not act as an operating company except through its control of the subsidiary corporations, which operated the properties in question. The business of the Massachusetts Electric Companies consisted of holding the stock of the subsidiaries and supervising their management by means of stock control, and assisting in their financing. . . . Previous to February 26, 1903, a large number of trustees in Massachusetts had invested trust funds in the preferred shares of the Massachusetts Electric Companies and held those investments on that date. Before making the investment in question, the trustee made reasonable inquiry among bankers and brokers to ascertain how they regarded the investment, and received favorable opinions. He acted in entire good faith and so far as the financial and general business conditions and prospect of earnings of the Massachusetts Electric Companies and of the properties controlled by it were concerned there was then no reason to believe the investment to be otherwise than financially sound." Regular dividends out of earnings at the rate of four per cent per annum

were paid on these shares to and including July 1, 1904. After
that none were paid until January, 1909, and since July 1, 1910,
in general they have been paid at the rate of two per cent. In
1912 an issue of new preferred stock was made to take up secur-
ities and three quarters per cent of dividends then accumulated.
The market value has much diminished.

The rule of law in this Commonwealth governing the conduct
of trustees in the investment of the principal of their funds was
stated in these words in 1830 in *Harvard College* v. *Amory,* 9 Pick.
446, 461: "All that can be required of a trustee to invest,
is, that he shall conduct himself faithfully and exercise a sound
discretion. He is to observe how men of prudence, discretion
and intelligence manage their own affairs, not in regard to specu-
lation, but in regard to the permanent disposition of their funds,
considering the probable income, as well as the probable safety
of the capital to be invested." Good faith and sound discretion,
as these terms ought to be understood by reasonable men of
good judgment, were thus made the standard by which the con-
duct of trustees is to be measured. That is a comprehensive
principle. It is wide in its scope. It is not limited to a partic-
ular time or a special neighborhood. It is general and inclusive,
so that while remaining itself fixed, it may continue to be a safe
guide under new financial institutions and business customs,
changed commercial methods and practices, altered monetary
usages and investment combinations. It avoids the inflexibility
of definite classification of securities, it disregards the optimism of
the promoter, and eschews the exuberance of the speculator. It
holds fast to common sense and depends on practical experience.
It is susceptible of being adapted to whatever conditions may
arise in the evolution of society and the progress of civilization.
Although more liberal to investing trustees than the law of some
States and countries, it has frequently been reaffirmed and never
doubted in this jurisdiction. *Lovell* v. *Minot,* 20 Pick. 116.
*Brown* v. *French,* 125 Mass. 410. *Pine* v. *White,* 175 Mass. 585,
590. *Green* v. *Crapo,* 181 Mass. 55. *Corkery* v. *Dorsey,* 223
Mass. 97, 101.

In the application of this rule to varying facts it often has been
held that, while some investment of trust funds in certain se-
curities might be justified, a disproportionate amount of the total

ought not to be embarked in a single kind of stock or bonds. *Dickinson, appellant,* 152 Mass. 184. *Davis, appellant,* 183 Mass. 499. That particular point is not within the present report and therefore is not before us. Several cases have arisen where the facts showed improper investments in improvements upon real estate. *Brigham* v. *Morgan,* 185 Mass. 27. *Warren* v. *Pazolt,* 203 Mass. 328. In *Taft* v. *Smith,* 186 Mass. 31, a second mortgage upon real estate, and in *Thayer* v. *Dewey,* 185 Mass. 68, land in another State, were held not improper investments as matter of law upon the facts disclosed. It was decided in *Kinmonth* v. *Brigham,* 5 Allen, 270, 279, that the investment in a trading partnership could not be sanctioned.

The precise point reported for our determination is "Whether the organization of the Massachusetts Electric Companies was such on February 26, 1903, that the investment of any portion of the trust funds in its preferred shares was as a matter of law improper." Put in another way, it is, whether a finding that such investment was proper as matter of fact must be pronounced wrong as matter of law. The form of the report imports a finding of all facts, so far as the facts can go, in favor of the investment.

Tested by the standard established by our law, it cannot quite be said that in February, 1903, the investment of any portion of trust funds in preferred shares of the Massachusetts Electric Companies was improper and unwarranted as matter of law.

It might have been found from the nature of the properties held by the companies, the character of the agreement and the general purposes of the so called trust, that it was designed as a permanent investment, that the combination in a single ownership of the stock of so many different public service corporations covering such extent of territory and serving as matter of common knowledge numerous populous communities, was expected to equalize fluctuations of earnings and to stabilize the rate of dividends. The corporations whose securities were held were not in process of construction but were completed properties in actual operation. The extent of their earnings is not shown, but regular payments in way of dividends were made until a considerable period after the present investment was made. The form in which the case is presented to us warrants and even requires the assumption that the earning power of the public serv-

ice corporations whose securities were owned had been sufficiently tested so that at the time of the investment prudent and sagacious men of experience made purchases of these shares for permanent holding.

In the light of the agreed facts and the form of the report it is not necessary to determine whether the agreement and declaration of trust constituted a partnership among the shareholders as in *Williams* v. *Boston,* 208 Mass. 497, *Frost* v. *Thompson,* 219 Mass. 360, see *Dana* v. *Treasurer & Receiver General,* 227 Mass. 562, or a trust as in *Williams* v. *Milton,* 215 Mass. 1, where most of the earlier cases are reviewed. Assuming for the purposes of this decision that it was a partnership does not render the investment unwarranted as matter of law. On that assumption it was a partnership of a peculiar kind. It was not an ordinary business, commercial or trading partnership. The nature of its authorized investments seemingly removed it as far as possible from the common incidents of a copartnership adventure. Apparently it was guarded as fully as was practicable from speculative features and the oscillations of value incident to varying conditions of trade. There is nothing in the record to indicate that the amount of shares issued exceeded a conservative valuation of the securities owned. The rights of the shareholders were carefully guarded by the terms of the agreement. Their responsibility was reduced to a minimum so far as possible by written statement of obligations. It was expressly stated that the trustees had no power to bind the shareholders personally. All persons dealing with the trustees were confined by the agreement to the property of the so called trust to the exoneration of shareholders. See *Hussey* v. *Arnold,* 185 Mass. 202, 204; *Williams* v. *Boston,* 208 Mass. 497, 501; *Carr* v. *Leahy,* 217 Mass. 438, 440; *Rand* v. *Farquhar,* 226 Mass. 91, 96. It was required of the trustees to stipulate in every obligation into which they might enter that the shareholders should not be held liable personally. Whatever may be held ultimately as to the force and effect of those terms in the trust agreement, they manifest an effort to reduce the liability of the shareholders to the lowest limit. In any event, such liability of shareholders was not greater than the liability of stockholders in manufacturing corporations at the time the investment was made, which was before the court in *Harvard College* v. *Amory,*

9 Pick. 446. See *Child* v. *Boston & Fairhaven Iron Works,* 137 Mass. 516, for an historical review of our statutes respecting stockholders' liability for debts of the corporation. The exercise of sound judgment and good faith and a strict compliance with the terms of the agreement by the trustees would have a strong tendency to relieve the shareholders from all responsibility. The kind of corporations in which the trustees were to hold stock were chiefly and primarily public service corporations operating mainly in this Commonwealth, and of corporations incidental to or furnishing supplies to such public service corporations. The law of this Commonwealth for many years has made provision for careful supervision of the issue of stocks and bonds of public service corporations to the end that such securities may represent only honest investment necessary for valuable use to the public.

The agreed facts show that good faith and sound discretion, measured by the prevailing practice of men of experience and good judgment in such matters, were exercised in making the investment here assailed. That is the standard as established by the authorities to which reference has been made. Giving due weight to all the considerations affecting the trust agreement, no sufficient reason appears for declaring the investment unwarranted. The case is close, but falls within the rule of *Harvard College* v. *Amory, ubi supra.*

The retention of these shares and the failure to sell them before the end of the period of accounting cannot be declared improper as matter of law under all the circumstances. The decision of the question whether to sell an investment of trust funds on a falling market is a perplexing one. The agreed facts are that "except in so far as the propriety of retaining the investment was affected by the character of the organization in contemplation of law, there was nothing in the future outlook of the Massachusetts Electric Companies and its subsidiaries which required the trustee as a matter of sound discretion to dispose of the shares." The case upon this point is governed in principle by *Bowker* v. *Pierce,* 130 Mass. 262.

*Decree of Probate Court affirmed.*