The New England Trust Company, trustee, *vs.* Mary W. Paine & others.

Middlesex.   October 4, 1944. — February 1, 1945.

Present: Field, C.J., Lummus, Qua, Ronan, & Spalding, JJ.

*Probate Court*, Accounts, Findings by judge. *Constitutional Law*, Separation of powers of government. *Statute*, Retroactive. *Trust*, Exemption of trustee from liability, Breach of trust, Investments, Corporate trustee. *Devise and Legacy*, "Exculpatory clause." *Words*, "Wilful default," "Involuntary losses."

St. 1938, c. 154, would violate the principle of the separation of powers of government in art. 30 of the Declaration of Rights if it were interpreted and applied as converting a decree of a Probate Court entered in 1911, allowing a trustee's account subject to subsequent reopening for the correction of all errors under R. L. c. 150, § 17, into a decree final except only for being impeached for "fraud or manifest error."

The provision of St. 1938, c. 154, § 1, revising G. L. (Ter. Ed.) c. 206, § 24, "After final decree has been entered on any such [probate] account it shall not be impeached except for fraud or manifest error," does not apply to decrees entered before its effective date.

Trustee's accounts covering the earliest years of the trust and allowed by decrees of a Probate Court in 1911 subject to reopening under R. L. c. 150, § 17; G. L. and G. L. (Ter. Ed.) c. 206, § 19, were subject as of right to reconsideration, without previous revocation of the decrees, at a hearing of further accounts of the trustee held subsequent to the effective date of St. 1938, c. 154, and at such hearing a decree should be entered finally settling the entire account of the trust from its beginning to the end of the period covered by all the accounts.

A clause in a will, directing that the trustee of a trust established thereby should "not be responsible for involuntary losses, or to make good any portion of the estate save what shall be lost by . . . [his] own wilful default," showed a purpose of the testator to excuse the trustee both with respect to the consequences of any breach of trust that he did not intend to commit, knowing it to be a breach of trust, and from responsibility for any loss which he did not intend to bring about.

Upon appeal from a decree of a Probate Court upon an account after a hearing by the judge upon an auditor's report and other evidence, which was reported, this court must accept findings by the judge which adopted the findings by the auditor or which, so far as contrary or in addition thereto, were supported by the testimony and were not plainly wrong.

A trustee under a will, if, by delaying for many years in selling New England railroad stocks which constituted a proper investment when

bought in 1904 and 1905 but later declined in value, he failed to exercise the degree of judgment required of him in the circumstances, was exonerated from liability therefor to the beneficiary of the trust by a clause in the will providing that he should "not be responsible for involuntary losses, or to make good any portion of the estate save what shall be lost by . . . [his] own wilful default."

The manner in which a trust company delegated authority respecting the investments of trust funds held by it as trustee, and whether there was a violation of the company's rules governing the making of such investments, were immaterial at a hearing upon its accounts involving questions relating to the propriety of the investments.

Mere negligence of a trustee under a will either in failing to attempt to enforce the liability of guarantors of a defaulted mortgage held by him or in granting extensions of the mortgage which discharged the guarantors did not render the trustee liable to the beneficiary of the trust in view of a clause in the will providing that he should "not be responsible for involuntary losses, or to make good any portion of the estate save what shall be lost by . . . [his] own wilful default."

PETITION in the Probate Court for the county of Middlesex for the allowance of accounts.

The case was referred to an auditor and was afterwards heard by *Poland,* J.

*F. W. Campbell,* (*J. Wiggin* with him,) for the respondents.

*H. D. McLellan,* (*G. B. Rowlings & A. R. Stokes* with him,) for the petitioner.

QUA, J. The respondents, beneficiaries of the trust created by Article Sixth of the will of James A. Woolson, late of Cambridge, appeal from a decree of the Probate Court allowing the seventh to the thirty-fifth accounts, inclusive, of the New England Trust Company as trustee.

The administration of this trust began May 4, 1904. The first six accounts covered the period to May 16, 1910, and were allowed at different times down to January 16, 1911, when the sixth account was allowed. The seventh to thirty-fifth accounts, inclusive, covered the period from May 16, 1910, to July 8, 1939. At the hearing on these later accounts the judge ruled that by reason of the repeal of G. L. (Ter. Ed.) c. 206, § 19, by St. 1938, c. 154, § 2, the items of the first six accounts were not open for review and refused to hear evidence relating to those accounts. He entered the decree appealed from on the seventh to the thirty-fifth accounts, inclusive, "without prejudice to any

rights which the respondents or any of them may have incident or consequent to their petition [then on file] to vacate the decrees allowing the first six accounts of the accountant."

The appellants contend that there was error in the judge's refusal to reopen the earlier accounts at the hearing on the later accounts. and in entering the decree upon the later accounts without prejudice as hereinbefore stated. They also contend that there was error in the refusal of the judge to surcharge the trustee for alleged breaches of trust during the period covered by the later accounts with which the judge did undertake to deal.

There was error in the refusal to reopen and consider the first six accounts and in entering the decree on the later accounts without prejudice. The Revised Laws of 1902 were in force when the earlier accounts were allowed. While the Revised Laws, c. 150, §§ 17 and 22, and the corresponding provisions of the General Laws and of the Tercentenary Edition, c. 206, §§ 19 and 24, were in force before the enactment of St. 1938, c. 154, upon the settlement of an account, "all former accounts of the same accountant . . . [might] be so far opened as to correct a mistake or error therein," except as to matters in dispute previously heard and determined by the court, which matters could be again brought in question only by leave of the court. R. L. c. 150, § 17. G. L. (and G. L. [Ter. Ed.]) c. 206, § 19. These statutes were held to permit a full and complete investigation of the items of the earlier accounts. *Barrett* v. *Briry,* 256 Mass. 45. *Coulson* v. *Seeley,* 277 Mass. 559, 562–563. *Waitt* v. *Harvey,* 312 Mass. 384, 396. There is nothing in the record to show that any of the items of the earlier accounts was actually in dispute and was heard and determined by the court. We must assume that none of them was actually in dispute, heard and determined. *Barrett* v. *Briry,* 256 Mass. 45, 46. *Coulson* v. *Seeley,* 277 Mass. 559, 562–563. *Greene* v. *Springfield Safe Deposit & Trust Co.* 295 Mass. 148, 151. To be sure, R. L. c. 150, § 22, provided a special method by which it was possible to have all the items of an account definitively settled, whether or not they were then actually disputed and

heard. The same provisions were continued in the successor section, G. L. (and G. L. [Ter. Ed.]) c. 206, § 24, but it does not appear that any of the earlier accounts was settled by the method so provided. Those accounts must therefore be deemed to have been allowed subject to the provisions of R. L. c. 150, § 17, with respect to being reopened upon the settlement of subsequent accounts. *Greene* v. *Springfield Safe Deposit & Trust Co.* 295 Mass. 148, 151. It follows that the decrees allowing the first six accounts were not final decisions upon the items contained in those accounts. Those items could be tried out at the hearing upon any later account.

The subsequent enactment of St. 1938, c. 154, repealing G. L. (Ter. Ed.) c. 206, § 19 (the successor to R. L. c. 150, § 17), completely redrafting G. L. (Ter. Ed.) c. 206, § 24 (the successor to R. L. c. 150, § 22), and inserting therein a provision that "after final decree has been entered on . . . [an account filed in a Probate Court] it shall not be impeached except for fraud or manifest error," did not have the effect of converting the decrees on the earlier accounts, which were subject as of right to reopening generally by any interested party, into fully effective final decrees, subject only to being impeached, as are other final decrees in various ways, for "fraud or manifest error." The rendition of a final decree determinative of the rights of parties in litigation is preëminently a judicial act. *Denny* v. *Mattoon*, 2 Allen, 361, 379. Such an act cannot be accomplished by legislative fiat. An attempt to do so would violate the fundamental principle of the separation of powers set forth in art. 30 of the Declaration of Rights. Decisions of this court hereinbefore cited show that as the law stood when the first six accounts were allowed the decrees allowing them did not adjudicate the rights of the parties. The items of those accounts remained subject to correction for all errors and not merely for errors of a kind similar to those which all courts have inherent power to correct after final decree. A construction of the 1938 act which would enlarge the effect of the earlier decrees would make of that act something more than a mere modification or withdrawal of statutory

rights previously granted but creating no vested interest, as in *Wilson* v. *Head*, 184 Mass. 515, 518–519, and *Pittsley* v. *David*, 298 Mass. 552, 554–557. Parties may have refrained from taking part in the earlier accountings in the knowledge that the decrees would not bind them, and that they had the right to correct errors when later accounts .should be presented. Such parties cannot now be confronted with what would in substance be a legislative decree permanently depriving them of their right to be heard upon questions involving their vested property rights which have never in any real sense been litigated at all.

In *Sparhawk* v. *Sparhawk*, 116 Mass. 315, 320, it was held that the provision of St. 1874, c. 397, § 1, that "all divorces nisi heretofore decreed" under St. 1870, c. 404, "shall be deemed and taken to be, and have the force and effect of, absolute divorces from the bonds of matrimony" would attribute "to judicial decrees, rendered before its passage, a force and operation which they did not have when they were made," and would exceed the power of the Legislature under the Constitution. Conversely it was held with convincing logic in *Denny* v. *Mattoon*, 2 Allen, 361, 376–380, that a statute having the effect of taking away the quality of finality from a judicial decree that was final when entered would violate art. 30 of the Declaration of Rights. To similar effect are *Casieri's Case*, 286 Mass. 50, 55–56, and *Ziccardi's Case*, 287 Mass. 588. Pertinent also are *Forster* v. *Forster*, 129 Mass. 559, 561–562, *Dinan* v. *Swig*, 223 Mass. 516, 520, *Opinion of the Justices*, 234 Mass. 612, 621, *Cosmopolitan Trust Co.* v. *Mitchell*, 242 Mass. 95, 116, *Worcester County National Bank, petitioner*, 263 Mass. 444, 456–460, *Pennsylvania* v. *Wheeling & Belmont Bridge Co.* 18 How. 421, 431, *United States* v. *Klein*, 13 Wall. 128, 146–148, and *Hodges* v. *Snyder*, 261 U. S. 600, 603.

We need not consider whether the 1938 act would be open to any other objection on constitutional grounds if it were construed to foreclose inquiry into the items of accounts allowed before it took effect. For the reasons stated, that sentence of G. L. (Ter. Ed.) c. 206, § 24, as appearing in St. 1938, c. 154, § 1, which reads, "After final decree has

been entered on any such account it shall not be impeached except for fraud or manifest error," must be construed to apply prospectively to decrees entered after the statute took effect and not to apply retrospectively to decrees entered before it took effect. See *Hanscom* v. *Malden & Melrose Gas Light Co.* 220 Mass. 1; *Pittsley* v. *David,* 298 Mass. 552, 554; *Ring* v. *Woburn,* 311 Mass. 679, 682. The statute of 1938 therefore left the first six accounts still subject to reconsideration at a proper time and by a proper method.

We think that the hearing on the later accounts provided that time and method after as well as before the repeal of G. L. (Ter. Ed.) c. 206, § 19. While § 19 was in force, this court had held for reasons not wholly dependent upon the terms of that section that earlier accounts were open at the hearings upon later accounts without first vacating the decrees allowing the earlier accounts. *Barrett* v. *Briry,* 256 Mass. 45. In that case decisions were cited which antedated the origin of § 19 (Rev. Sts. c. 67, § 10) and wherein such inherent power as the court had apart from statute to re-open former accounts upon settling later accounts was exercised without first vacating the decrees upon the earlier accounts. *Stearns* v. *Stearns,* 1 Pick. 157. *Field* v. *Hitch-cock,* 14 Pick. 405. To the same effect are *Stetson* v. *Bass,* 9 Pick. 27, and *Boynton* v. *Dyer,* 18 Pick. 1, 5. See these cases discussed in *Waters* v. *Stickney,* 12 Allen, 1, 11. It is not likely that when the Legislature repealed § 19 it intended to require a different and more circuitous method of reviewing previous decrees that remained subject to review than the method that had been used for a similar purpose before that section and its predecessor statutes were enacted.

Moreover, it is the general object of probate accountings to settle in definite figures the credits and charges in favor of and against the accountant and to set up a balance remaining in his hands as a basis for future accounting. See *Burns* v. *Hovey,* 242 Mass. 363, 366–367. It was the object of the Legislature in enacting St. 1938, c. 154, to make each accounting thereafter a final decision, "except for fraud or manifest error." *Waitt* v. *Harvey,* 312 Mass. 384, 396–397.

*Jose* v. *Lyman*, 316 Mass. 271, 280.[1]   These objects are not fully accomplished by a decree which passes only upon current items during the accounting period and leaves open for future determination "without prejudice" the sums carried over from previous accounts and therefore also the sums to be carried over to later accounts.

We conclude for the reasons hereinbefore stated that the decree allowing the seventh to thirty-fifth accounts, inclusive, without consideration of the previous accounts and without prejudice in respect to the respondents' petition to vacate the decrees allowing those accounts must be reversed and there must be a further hearing upon the seventh to thirty-fifth accounts, inclusive, at which the earlier accounts are to be reconsidered, and after which a decree is to be entered finally settling the entire account of the trust to the end of the period covered by the thirty-fifth account.

This opinion might end at this point, but questions as to alleged breaches of trust during the period covered by the seventh to thirty-fifth accounts, inclusive, have been fully argued upon a voluminous record and upon briefs evidently prepared at great expense.   These questions will still be important at the further hearing of the seventh to thirty-fifth accounts and some of them may be equally important in dealing with the reopened first to sixth accounts.   We feel therefore that we should deal with some of these questions in this opinion.

All claims of breach of trust in this case must be considered with direct reference to a so called "exculpatory clause" contained in Article Sixth of the will.   This clause reads, "I furthermore direct that my said trustee shall not be responsible for involuntary losses, or to make good any portion of the estate save what shall be lost by its own wilful default." "Wilful default" has been defined as "intentionally making away with the trust property." *Warren* v. *Pazolt*, 203 Mass. 328, 347.   See *Anderson* v. *Bean*, 272 Mass. 432, 447.   Wilful means intentional.   *Commonwealth* v. *Welansky*, 316 Mass. 383, 397.   Frequently it has also been interpreted as

---

[1] See 21 Mass. Law Q. No. 3, 14–24; 24 Ibid. No. 4, 7.

implying a bad purpose.  See *Commonwealth* v. *Kneeland*, 20 Pick. 206, 220; *Thompson* v. *Hays*, 11 Fed. (2d) 244, 248. So even if some failure of the trustee to perform its duty which falls short of actually "making away with the trust property," such for example as a failure to invest, can nevertheless be called a "default," the testator purported to excuse his trustee from responsibility for any loss resulting from it unless the default was intentional, that is, brought about as an act of the will and with the knowledge that it was a default.  "Wilful" modifies "default."  It is the default which is wilful, that is, intentional.  "Wilful default" therefore does not include a breach of trust which is not known to be such but which merely results from the intentional act or refraining to act of the trustee.  Almost every act or refraining to act of most trustees is intentional and not accidental or inadvertent.  An interpretation of "wilful default" which would include every intentional act or refraining to act that in fact ultimately brings about a default would render the expression "wilful default" in the exculpatory clause so impotent that it cannot reasonably be supposed the testator used those words in that sense.  See *In re Mallon's Estate*, 43 Misc. (N. Y.) 569, affirmed, sub nomine *Matter of Howard*, upon somewhat different grounds, 110 App. Div. (N. Y.) 61, 185 N. Y. 539; *Harvey* v. *Guaranty Trust Co.* 134 Misc. (N. Y.) 417, 426–427, affirmed 229 App. Div. (N. Y.) 774, 256 N. Y. 526; *Roseville Trust Co.* v. *American Surety Co.* 91 N. J. L. 588, 591; *Van Siclen* v. *Bartol*, 95 Fed. 793, 798; *Thompson* v. *Hays*, 11 Fed. (2d) 244, 248; Bogert, Trusts and Trustees, § 542, at page 1718. "Involuntary losses" would seem to mean losses not intentionally or voluntarily incurred.  These words can hardly be limited to losses that the trustee is powerless to prevent, since it would not be liable for such losses in any case.  The trustee is entitled to the benefit of both parts of the sentence constituting the exculpatory clause.  We think, therefore, that it was the purpose of the testator to excuse his trustee both with respect to the consequences of any breach of trust that it did not intend to commit, knowing it to be a breach of trust, and from responsibility for any loss that it did not

intend to bring about. So under this exculpatory clause the trustee would be relieved from liability for negligence or failure to exercise sound judgment amounting to a breach of trust and even for an intentional breach of trust unless there was also an intent to cause loss. No less complete exoneration seems consistent with the words employed when the general purpose of the exculpatory clause is kept in mind.

The law does not look with special favor upon attempts to impair the breadth and strength of the safeguards which experience has erected for the protection of those whose property has been confided to the good faith and sound judgment of trustees. And certainly this general attitude should not be softened first for the benefit of trust companies and professional trustees who hold themselves out as fully conversant with the duties of trustees and fully competent to perform them. Nevertheless, exculpatory provisions inserted in the trust instrument without any overreaching or abuse by the trustee of any fiduciary or confidential relationship to the settlor are generally held effective except as to breaches of trust "committed in bad faith or intentionally or with reckless indifference to the interest of the beneficiary" and as to "any profit which the trustee has derived from a breach of trust." Am. Law Inst. Restatement: Trusts, § 222. Scott on Trusts, §§ 222–222.4. *Browning* v. *Fidelity Trust Co.* 250 Fed. 321, 325. Our own decisions go at least as far as this in supporting such provisions, *Warren* v. *Pazolt,* 203 Mass. 328, 346–347; *Dreyfus* v. *Old Colony Trust Co.* 218 Mass. 546, 555; *Digney* v. *Blanchard,* 226 Mass. 335, 337; *Anderson* v. *Bean,* 272 Mass. 432, 447; *Peterson* v. *Hopson,* 306 Mass. 597, 609–610; *Milbank* v. *J. C. Littlefield, Inc.* 310 Mass. 55, 62, and some of them seem to go farther and to sanction exculpatory clauses making bad faith alone the test of liability of the trustee. *Davis, appellant,* 183 Mass. 499. *North Adams National Bank* v. *Curtiss,* 278 Mass. 471, 476, 477, 478. See, however, *Peterson* v. *Hopson,* 306 Mass. 597, 610. We discover nothing in the General Laws relating to trust companies or in the acts of incorporation of the accountant that

deprives it of the protection of any exculpatory clause that would be valid in favor of an individual trustee. See G. L. (Ter. Ed.) c. 172, §§ 52, 53, 55; St. 1869, c. 182, § 5; St. 1877, c. 239, § 1. But if we assume, without deciding, that the testator could not lawfully exonerate his trustee from liability for all losses not consciously intended or designed, as we think he purported to do by the clause inserted in his will, and if we assume that the exemption, in spite of its broader language, must in legal effect be confined within the limits laid down in the section of the Restatement from which we have quoted above, the only remaining questions in the case will be whether the accountant has been guilty of breaches of trust either in bad faith or intentionally or with reckless indifference to the interest of the beneficiaries. We say these are the only remaining questions in the case because there was no evidence, and there is no contention, that the exculpatory clause was inserted in the will through any overreaching or abuse of confidence on the part of the trustee, or even at its request or desire, or that the trustee derived any profit through any alleged breach of trust.

The case was referred to an auditor, who filed a comprehensive and careful report. The judge heard the case upon the auditor's report and additional evidence. The judge adopted the findings of the auditor, except as to one or two matters, and made additional findings of his own. The evidence before the judge is reported. The judge saw the witnesses. The case is one in which their appearance and manner of testifying might be important in determining the weight to be given to their testimony. The evidence supports the subsidiary findings of the judge in all substantial respects. Where these findings differ from the findings of the auditor, there was evidence before the judge on which they could rest. We cannot say that they are plainly wrong. We must accept as the basis of this opinion the findings of the judge, including those of the auditor except in the one or two instances in which the latter conflict with the findings of the judge.

We now deal briefly with the several contentions of the respondents as to alleged breaches of trust by the account-

ant during the period covered by the seventh to thirty-fifth accounts, inclusive, the only accounts fully heard in the court below. These accounts run from May 16, 1910, to July 8, 1939, hereinafter called the accounting period. We deal with the respondents' contentions only in so far as we deem them to be supported by plausible argument and in so far as dealing with them is likely to be useful in the further progress of the case, and we deal with them primarily with reference to whether, if breaches of trust were committed, the accountant is excused from liability for such breaches by the exculpatory clause.

1. The respondents' chief complaint arises out of the retention by the trustee throughout the accounting period of large investments in the stocks of New England railroads. These include preferred stocks in the Boston and Maine Railroad and stocks in several leased lines, stocks in the New York, New Haven and Hartford Railroad and leased lines, and stock in the Boston and Albany Railroad.

The initial investments in these railroads were made in 1904 and in 1905 soon after the trustee was appointed and before the accounting period began. At the beginning of the trust the entire trust fund amounted to $400,000, and approximately half of it was put into these securities. However, the sum expended in purchasing the stock of any one railroad did not exceed ten per cent of the total trust fund, although the combined investment in one system, that of the Boston and Maine, amounted to twenty-three and forty-six hundredths per cent of the fund.[1] The combined investments in each of the other systems were substantially less. Comparatively small additional purchases of stock in the New York, New Haven and Hartford Railroad in 1908 and 1910 do not affect the correctness of these statements. Although the stocks in the leased roads were not exactly equivalent to stocks in the operating roads, each lessor stock

---

[1] This percentage was very slightly increased later by the purchase of one additional share in the Fitchburg Railroad for $127.25 and by the additional net investment of $5,399.89 in Boston and Maine prior preferred stock in order to take advantage of an offer made in the course of a reorganization. A large majority of the stockholders accepted this offer, and upon the findings of the auditor all but $1,224 of this additional investment appears to have been a proper salvage operation.

was dependent for its earning power upon the earning power of the system as a whole of which the leased line was a part, and the auditor, in substance, found that the investment in each system should be regarded as a unit. This finding, however, is qualified by the further findings that the lessor lines did not cease to pay dividends when the lessee lines ceased, and that some of them paid throughout the entire accounting period. These securities in themselves, overlooking for the moment the proportions of the estate invested in them, were proper trust investments when they were purchased. They had a long history of productive return, were located "in a prime industrial area," were conservatively capitalized and readily marketable, and their future income producing capacity was reasonably assured. They had an "artificial" value in that they were exempt from local taxation at a time when securities in general were subject to such taxation at local rates upon their market values before the enactment of St. 1916, c. 269, which substituted a tax of six per cent upon their dividends. This feature created a great demand among trustees for these stocks. This advantage, however, was lost by the change in the tax law in 1916. In 1911 and thereafter the earnings of the lessee railroads declined, and in 1913 the New York, New Haven and Hartford and the Boston and Maine suspended dividends. Few dividends have been paid since that time on the stocks in these roads held by the trust. Of course the value of the stocks fell. Dividend payments of the leased roads did not follow the same pattern as those of the operating roads, and all except two of the former continued to pay to the end of the accounting period. The Boston and Albany also continued to pay. The history of the New England railroads from 1911 or 1912 to 1939, with their receiverships, reorganizations and consolidations of lessor and lessee roads is too long to be repeated here. Their condition improved at times, and their future appeared more hopeful. Later the trend would be reversed. War and depression played a prominent part. After 1912 the stocks in the Boston and Maine and in the New York, New Haven and Hartford systems ceased to be proper for trus-

tees to purchase. Nevertheless, the trustee continued to hold them, except for thirty-one shares of New York, New Haven and Hartford sold in 1934 and seventy-nine shares of Old Colony sold in 1935 at a "fair price." At the close of the accounting period the combined value of the stocks retained had shrunk to $26,181.13, leaving the apparent loss on the railroad stocks as of that time nearly $179,000.

The auditor found that it was the duty of the trustee to sell the common stock in the New York, New Haven and Hartford Railroad on April 1, 1917, instead of waiting until 1934. He found that the trustee had acted reasonably in continuing to hold the Boston and Maine preferred stocks; that in view of circumstances stated in detail by him the continued holding of stock in leased lines of these two systems was not unreasonable; and that a reasonable time in which to dispose of these stocks had not expired at the close of the accounting period. There is no finding of any improper conduct in connection with the Boston and Albany stock, which has continued to pay dividends regularly. There is a finding that from the standpoint of proper diversification of investments there was an excessive investment in the Boston and Maine system to the amount of $23,941.25 more than was reasonable and prudent, but all of this investment except $1,224 paid in connection with a reorganization and a small item of $127.25 was made before the accounting period began, and in so far as the overinvestment concerns the seventh to thirty-fifth accounts, inclusive, taken by themselves as the judge took them at the hearing, it raises (except as to the items just mentioned) only the question as to the proper time for disposal of the excess, which is substantially the same question that is raised in connection with all the railroad stocks. There is no hard and fast rule as to the extent of diversification required. *North Adams National Bank* v. *Curtiss*, 278 Mass. 471, 482. The principles set forth in *Harvard College* v. *Amory*, 9 Pick. 446, 461, govern trustees in the matter of diversification as in other problems of investment. *Dickinson, appellant*, 152 Mass. 184. *Davis, appellant*, 183 Mass. 499.

In addition to the facts stated in the two preceding paragraphs, taken from the auditor's findings and adopted by the judge, the judge had before him at the hearing much additional evidence that until 1912 all these railroad stocks were held in high esteem for trust investment; that at least until 1916 there was but a limited range of available trust investments for Massachusetts trustees; that at that period diversification was not practised as extensively as at present; that this trust was sufficiently diversified according to the standards of that time; and that after the stocks had been acquired it was prudent to hold them through the accounting period in the reasonable expectation that they would make a substantial recovery. Evidence tending to the contrary need not be stated. The judge found that "a competent trustee reasonably could have reached the conclusion that the retention of the railroad securities was proper under all the circumstances"; that the "motives" of the accountant were "always to act for the best interest of the estate"; and that, "taking the evidence most strongly in favor of the respondents, the retention of the railroad stocks was at most a mistake of judgment."

It is obvious that in dealing with these railroad stocks the trustee was confronted with a serious problem about which the judgments of experienced investors might differ. "The decision of the question whether to sell an investment of trust funds on a falling market is a perplexing one." *Kimball* v. *Whitney*, 233 Mass. 321, 334. Other illustrative cases are *Bowker* v. *Pierce*, 130 Mass. 262, *Green* v. *Crapo*, 181 Mass. 55, *Creed* v. *McAleer*, 275 Mass. 353, *First National Bank* v. *Truesdale Hospital*, 288 Mass. 35, 46, and *McInnes* v. *Whitman*, 313 Mass. 19, 28–31. See Scott on Trusts, § 230.2. The only breaches of trust found in connection with these stocks (if indeed, when the findings of the judge are superimposed upon those of the auditor, it can be said that any finding of breach of trust remains) consisted in delay in selling thirty-one shares of New York, New Haven and Hartford and in a rather disproportionately large investment in the Boston and Maine system. At most, these were no more than failures to exercise the degree

of judgment required in the circumstances. They did not amount to bad faith or to intentional breaches of trust or to reckless indifference to the interest of the beneficiaries. The judge rightly ruled that the exculpatory clause exonerated the accountant.

2. In connection with the railroad investments and with other matters hereinafter mentioned, the respondents contend that the accountant, through its finance and trust committees, wrongfully delegated to its actuary and later to its president, or to a trust officer, discretion in matters relating to investments which should have been exercised by these committees themselves; that such officers in the first instance made purchases of securities and allocated them to the various trusts before approval by the proper committee, although after 1916 such purchases were made from previously approved lists; that reports of the trust committee to the finance committee did not disclose for which trusts securities were bought; and that these were violations of rules established by the directors of the accountant. It appeared, however, as we interpret the auditor's findings, that during the accounting period all purchases and allocations were made by officers of the accountant regularly in charge of such matters and were shortly afterwards reported to the trust committee and were formally or informally approved by the committee at meetings held at first weekly and later twice a week. The judge found that the committee's approval was not merely perfunctory, and that the committee, composed of men of long experience and mature judgment in dealing with investment securities, considered intelligently the acquisition and the retention of the securities of the trust. Any corporation carrying on a trust business must of necessity act through officers or agents. There is nothing to show that those employed by the accountant were incompetent or improper persons to employ for this purpose. See Scott on Trusts, § 171.4; *Milbank* v. *J. C. Littlefield, Inc.* 310 Mass. 55, 62. There is little analogy in the matter of acting through agents between a trust company and the peculiar type of corporation set up by special enactment to manage the Franklin fund which

was the subject of discussion in *Boston* v. *Curley*, 276 Mass. 549, 562, cited by the respondents. In the present case the trustee is not seeking to shield itself on the ground that it is not responsible for acts of its agents. See Am. Law Inst. Restatement: Trusts, § 225. It must and does accept responsibility for all their acts and must be judged by the way in which they administered the trust. In these circumstances we do not perceive that the accounting is affected by any question of delegation of authority or by a failure (if there was any) to observe the letter of rules made by the accountant for its own internal administration.

3. The respondents complain of an investment of $8,000 in participation certificates in a mortgage taken by the accountant in 1914 on real estate on Portland Street in Boston. This mortgage was originally for $80,000, but was reduced by payments to $65,000. It was defaulted in 1933. The accountant foreclosed and bought in the property in 1935. There has been no income since 1933, and the trust has been charged $424.75 for maintenance expense.

While the mortgage was in force, successive purchasers of the equity of redemption had become guarantors for its payment. Thereafter the accountant had agreed with subsequent owners of the equity to extend the mortgage. The accountant never made any attempt to collect the amount due on the mortgage by enforcing the agreements of the guarantors, though there was nothing to show that they were not financially responsible, and so far as appears the accountant gave no thought or attention to the possible liability of these guarantors. The auditor found that the failure of the accountant to make any effort to enforce against the guarantors their covenants to pay the mortgage was neglect of duty; but he also found that the amount lent was not excessive or unreasonable; that the loan was prudent and proper; that the value of the mortgaged premises down to June 10, 1932, when the last extension expired, was "at least equal to the amount due on the mortgage"; that "the contestants [respondents] do not question the propriety of the loan made on this mortgage"; that the property is still held for the benefit of the trusts holding partici-

pation certificates; and that "no loss to the trust estate is shown, it being not yet determined whether or not the real estate . . . is of sufficient value to cover the debt." The judge took a different view. He found that "the neglect of the accountant was not in failing to try to enforce the covenants of the guarantors but it was in granting the extensions . . . which discharged the guarantors" and in giving no consideration whatever to the effect of the extensions upon the guaranties. Whichever view may be the correct one in the particular circumstances of this case (see *Brown* v. *Kaplan*, 302 Mass. 510), it is apparent that at most the accountant was merely negligent in a way which may have caused no loss whatever. There was no bad faith or reckless indifference to the interest of the beneficiaries. Therefore the exculpatory clause relieves the accountant from liability.

4. The remaining issue relates to an investment in a participation certificate for $5,000 in a mortgage for $200,000 taken by the accountant in 1927 on real estate on Hanover Street in Boston. The facts need not be stated in detail. The auditor, after consideration of the pertinent factors, concluded that this loan was not an improper one for the accountant to make at the time. The respondents' further contention that the allocation of participation certificates to various trusts was improperly delegated to a trust officer has already been considered under the heading numbered 2 above. What we there said applies here. There was no breach of trust in connection with this investment.

Costs and expenses may be, but commonly are not, allowed upon a contested probate account, and we have found no reason for making an exception in this instance. *Wiley* v. *Fuller*, 310 Mass. 597, 602–604. *Berkshire Trust Co.* v. *Booth, ante*, 331, 336.

The decree allowing the trustee's seventh to thirty-fifth accounts, inclusive, is reversed, and the case is remanded to the Probate Court for further proceedings not inconsistent with this opinion. G. L. (Ter. Ed.) c. 215, § 28.

*So ordered.*