Marcus Richard Kimball et al. v.
The New England Trust Company, Trustee
(Estate of Marcus Morton Kimball)

Superior Court     Windham County     File No. 8803

Marcus Richard Kimball et al. v.
The New England Trust Company, Executor
(Estate of Marcus Morton Kimball)

Superior Court     Windham County     File No. 8804

Memorandum filed January 25, 1947.

*Day, Berry, & Howard,* of Hartford, and *Archibald Mac-donald,* of Putnam, for the Plaintiffs.

*Wiggin & Dana,* of New Haven, for the Defendant.

ALCORN, J. Two appeals from probate involving the same estate have been tried together and the issues thus presented are embraced in this single opinion.

Marcus Morton Kimball, late of Pomfret, Connecticut died on October 17, 1939, leaving a will naming the New England Trust Company, hereinafter referred to as the trust company, as executor and trustee. His will, after making certain specific bequests, left all of the rest, residue, and remainder of his property to the trust company in trust to pay the income to specific life tennants and at the death of the last of them to distribute the trust res in a designated manner.

The testator's sister, one of the life tennants, survived the testator but died January 2, 1943. The testator's sons, Day Kimball and Lawrence Kimball, also life tennants, are living and now receive the entire income. Day Kimball has had no children. Lawrence Kimball had two children at the time of the testator's death and they, Marcus Richard Kimball and Caroline Susan Kimball, are the present appellants by virtue of the fact that they are prospective remaindermen under the terms of the trust. The appellants are minors, British citizens, resident in England, and appear through a next friend who, by order of court, is guardian ad litem for them and for any unborn issue of either Day or Lawrence Kimball who might also be prospective remaindermen.

The will provided in paragraph 9:

"I direct my executor to pay all inheritance or succession taxes as part of the expenses of administration, so that specific legacies shall be paid in full."

Paragraph 8 of the will provided in part:

"I hereby give to my Executor or whoever shall execute this Will full power to sell, mortgage, hypothecate, invest, re-invest, exchange, manage, control, and in any way use and deal with any and all property of my estate during its administration, and, in no event, shall the Executor be liable for any loss or depreciation of property held by it as Executor hereunder unless such loss occurs through its bad faith or wilful default."

Paragraph 7 of the will provided in part:

"The Trustee shall have full power and authority to manage the trust property and to invest and re-invest the same, and, in its discretion, to sell the same, or any part thereof, at public auction or private sale. . . ."

Paragraph 8 provided in part:

"The trustee, in its discretion, may retain in the trust fund any property, real or personal, in the form of investment in which such property is received by the Trustee under this Will, even though the same is not a trust investment, or is unproductive of income, or is a larger proportion in one investment than the trust estate should hold, and in none of the foregoing cases shall the Trustee be liable for any loss or depreciation of said trust property, or any of it, and the Trustee shall not be responsible in any case for any depreciation or loss of the trust property unless such loss occurs through its bad faith or wilful default."

The trust company has a trust committee of seven members, four of whom are directors and the others are officers of the corporation. All are men of established experience. The trust committee meets twice each week and has full control of all trust matters including the authorization of purchases and sales. It reports monthly to a finance committee composed of the president ex-officio, and the members of the executive and trust committees. There is a trust department directed by a vice president who is appointed by the executive committee and empowered by the by-laws to have general direction and supervision of the trust department and, subject to the orders of the

trust committee, to invest and re-invest all funds and sell and transfer all securities entrusted to the department. Under this vice president are trust officers who supervise the several trust accounts. There is also a corporate trust and transfer department supervised by the secretary of the corporation and charged by the by-laws with the safekeeping of all securities belonging to individual trusts and the recording of all assets of individual trusts.

Within the trust department is an "investment division," headed by a vice president, which continually studies and analyzes investment securities. The work of the trust department is further divided for administrative purposes between an "estates division" handling problems of settlement and a "trust division" concerned with the handling of trust funds.

The established routine for an estate in settlement is for the estate division to make an analysis of cash requirements for settlement and submit it to the investment division, which then analyzes the securities held and recommends to the trust committee sales to realize the needed funds. In the case of trusts the routine is for the investment committee to recommend to the trust committee such sales as appear desirable. New trusts are reviewed at intervals of about three months until the holdings are considered proper, and then less frequently. In either case the trust committee makes the final decision and authorizes such sales as are made, giving wide discretion as to sale price and time of sale to the investment committee to meet market conditions.

The will was probated on November 15, 1939, and the trust company duly qualified as executor and, under date of February 23, 1940, filed an inventory of the estate totalling $900,994.09, of which $62,869.41 was in cash and $833,692.93 represented stocks and bonds. Included in the inventory were nine hundred shares of American Telephone and Telegraph Co., valued at $148,725; two thousand five hundred shares General Electric Co., valued at $102,500; and four hundred shares New England Telephone and Telegraph Co., valued at $46,750.

Lawrence Kimball and Day Kimball are naturalized British subjects and during the settlement of the estate were officers of the British army on active duty. On November 1, 1939, Lawrence Kimball wrote to an officer of the trust company in part as follows: "My brother, Day Kimball, and I have at last effected a meeting which has taken sometime to accomplish as we are both serving in the Army.

"In-so-far as matters rest with you, he and I strongly desire that there should be no distribution of any sort to us for the present, but that there should be a general accumulation to meet all bills, debts, expenses, charges and taxes."

In April, 1940, the trust company began making sales of substantial blocks of common and preferred stocks and bonds in the estate. On July 22, 1940, an officer of the trust company wrote to Day Kimball enclosing a list of securities held by the estate, in which the shares of General Electric, American Telephone and Telegraph and New England Telephone and Telegraph were included. In that letter the executor indicated the gross income to be $34,000 annually, cash on hand to be $144,-000, and the additional amount estimated to be needed to pay taxes, specific legacies and executor's compensation to be $59,-000, and expressed the opinion that income accumulated over a period of from two to two and one-half years would provide the necessary cash to complete liquidation, referring also to non-income paying securities which could be sold if necessary.

By January, 1941, the estate was substantially in readiness for final settlement and distribution. Because of the war and the situation and expressed wish of the life tenants, however, the trust company did not then distribute the estate. At this time about $38,930 in cash was needed for final settlement and this furnished one reason for some of the sales.

In November, 1941, the trust company's investment division, after an analysis of the securities in the estate, recommended to the trust committee the sale of over $200,000 worth of the estate's stocks and bonds including five hundred American Telephone and Telegraph, two hundred New England Telephone and Telegraph, and thirteen hundred General Electric. At a meeting of the trust committee on December 2, 1941, the recommendation was approved and the stock ordered sold, no price nor time of sale being specified.

At inventory values the testator's estate was invested 73 per cent in common stocks, and of these, American Telephone and Telegraph represented 16.5 per cent and General Electric 11.4 per cent of the total inventory. It is the general policy of the trust company to require diversification of trust funds about equally between fixed income bearing securities and equities, and to permit not more than 2.5 to 3 per cent of the total investment in any single security. The sales recommended at that time were in furtherance of this policy. Both stocks are, however, admittedly excellent individual investments.

On December 7, 1941, the Japanese attacked the United States at Pearl Harbor and, as a result of the ensuing war condition, the stock market in general receded. Responsible officers of the trust company considered the various circumstances involved, including reports of market trends and dividend prospects, and concluded that it was wise to proceed with the sales which had been ordered. Accordingly, on December 17, 1941, they sold nine hundred shares General Electric common; on December 22, 1941, four hundred shares General Electric common; on January 30, 1942, one hundred shares American Telephone and Telegraph common; on February 7, 1942, one hundred shares American Telephone and Telegraph common; on March 3, 1942, one hundred shares American Telephone and Telegraph common; and on April 30, 1942, two hundred shares American Telephone and Telegraph common. The sales were thus made in lots and at intervals over a period of about nineteen weeks, because that method was considered most desirable under market conditions.

The sales were made at prices below inventory value and below the prices at which they were quoted on the date the sale was authorized. Between December 15, 1941, and January 30, 1942, the executor sold all of the other bonds and stocks contained in the list recommended for sale by the investment committee except one hundred shares of Halifax Insurance and two hundred shares of New England Telephone and Telegraph. No question is raised by the appellants, however, of any of these sales except the General Electric and the American Telephone and Telegraph.

Thereafter the executor filed its final account as of September 10, 1942, which the Probate Court duly allowed and approved. This account shows assets comprising the trust fund under the will delivered to the trust company as trustee on September 9, 1942, in the total inventory value of $539,258.65. Included in the assets distributed to the trustee is an item of income earned during settlement upon funds used to pay debts, specific legacies and other expenses of administration. This amount is agreed by the parties to be $10,036, and the appellee concedes that this item should be added to capital if the court concludes that Connecticut law governs its disposition.

Following the allowance of the executor's final account, the trust company, as trustee, filed its first account as of April 5, 1943, reciting further sales of bonds and stocks by the trustee

between October 4, 1942, and February 27, 1943. Included in such sales were the shares of Halifax Insurance and New England Telephone and Telegraph which the trust committee had voted to sell in 1941; and the sales, on November 19, 1942, of six hundred shares General Electric common; on November 23, 1942, of two hundred shares New England Telephone and Telegraph; on November 23, 1942, of two hundred shares American Telephone and Telegraph; and on February 3, 1943, of one hundred shares American Telephone and Telegraph. These sales were made after a further review of the trust assets in October, 1942, and by virtue of a vote of the trust committee. The appellants complain of the sale of the General Electric, American Telephone and Telegraph, and New England Tele· phone and Telegraph stock, but not on any of the other sales made during this period.

The account also recites an item of $3,632.61 paid out by the trustee on September 11, 1942, for "Trustee's compensa· tion for services on income collected in Estate 1/15/40-9/1/42."

During the period elapsed since the probate of the will the Trust Company has periodically invested cash of the estate, whether realized from the sale of securities or otherwise, in other stocks and bonds. Due to general market conditions, se· curities in the trust decreased from an inventory value of $637,-058.65 at the date of the testator's death to $539,258.65 at the date of the trustee's account and rose again on November 1, 1946, to $696,140.03. The entire decline was in common stock values while bonds and preferred stock advanced during the same period. Common stocks purchased by the trustee immediately following the 1942 sales of General Electric and the telephone companies had increased 40 per cent in value at the time of trial, whereas during the same period the stocks sold had in· creased but 29.6 per cent.

The amended reasons of appeal from the allowance of the trust company's account as executor are that (1) the executor paid itself as trustee income on sums paid out in settlement of the estate which should have gone to increase the trust principal; and (2) the corpus of the estate was depleted by the sale of securities in connection with which the executor failed to ex· ercise the required prudence and sound judgment. The amend· ed reasons of appeal from the allowance of the trustee's account are that (1) the trustee received from itself as executor income

on sums used in settlement of the estate which should have gone to increase trust principal; (2) the trustee improperly paid itself a fee from income for services from January 15, 1940, to September 1, 1942; and (3) the corpus of the estate was depleted by the sale of securities in connection with which the trustee failed to exercise the required prudence and sound judgment.

No issue is made of the right of the appellants to take these appeals. They have a prospective interest in the estate as heirs of Lawrence Kimball. Their interest, however, is a remainder interest, subject to the life estates. The life tenants, but not the appellants, may be "agrieved" by the Probate Court's approval of an item which reduces the income payable to the life tenants. The payment by the trustee of a fee for its own services is of such a nature, and it necessarily follows that these appellants cannot avail themselves of the second reason of appeal from the trustee's account, and the issue presented by it is decided adversely to them. General Statutes, § 4990.

A corollary consideration is the claim that the trust company as executor improperly paid and as trustee improperly received $10,036 as income which should have gone to the benefit of these appellants as capital. The disposition, distribution, and succession of personal property, wherever situated, is governed by the law of the owner's domicil at the time of his death. *Holcomb* v. *Phelps*, 16 Conn. 127; *Beach* v. *Norton*, 9 Conn. 182, 200. This testator was domiciled in Connecticut. Under the law of this state life tenants are entitled to the income from the clear residue of an estate from the date of the testator's death unless the will fixes a different time for the use to begin. *Bancroft* v. *Security Co.*, 74 Conn. 218; *Chase National Bank* v. *Schleussner*, 117 Conn. 370, 376. The unexpended income from the fund used to pay debts and expenses of settlement becomes a part of the corpus of the estate *Bridgeport Trust Co.* v. *Fowler*, 102 Conn. 318. The Trust Company, therefore, should not, as executor, have paid itself as trustee and should not as trustee have accepted the item of $10,036 as income, and the Probate Court erred in approving the two accounts making such allocation.

It remains to consider the reasons of appeal complaining of the sales of the shares of General Electric, American Telephone and Telegraph and New England Telephone and Telegraph.

Ordinarily, property is distributed in the form in which it exists at the time of the owner's death. *Gardner's Appeal,* 81 Conn. 171, 178. The legal title to personalty vests in the executor at the moment of the decedent's death and he can convey it or make other proper use of it; and the title does not vest in the beneficiary until distribution. B*lodgett* v. *Bridgeport City Trust Co.,* 115 Conn. 127 145; B*eecher* v. *Buckingham,* 18 Conn. 110, 121.

It is a generally accepted rule, however, that an executor must not sell personal property of an estate except in the exercise of good faith and reasonable prudence for the benefit of the estate and without perversion of the assets to other purposes. 3 Schuler, Wills (6th Ed.) § 2344. The executor's primary duty is to settle the estate, pay debts, and make distribution, and not to sell and re-invest the assets. The circumstances may be such, however, as to make a sale appear to be desirable. In this case the testator gave the Trust Company, both as executor and as trustee, broad power to sell or otherwise deal with the estate during administration, and with the trust fund when established, as he was entitled to do. 3 Schouler, Op. Cit. § 2346.

The general rule as to the duty of a trustee is that he must exercise due diligence in the light of the particular circumstances surrounding the administration of his trust. *McClure* v. *Middletown Trust Co.,* 95 Conn. 148, 153; *New Haven Trust Co.* v. *Doherty,* 75 Conn. 555, 560. He must act as a prudent man under the circumstances. *Lyman* v. *Stevens,* 123 Conn. 591, 599; 2 Scott, Trusts, § 174. The courts have no occasion to interfere unless it appears that the trustee has not acted in good faith or that he has abused the discretion vested in him. *McCarthy* v. *Tierney,* 116 Conn. 588, 592. A mere error of judgment does not impose liability. Matter of Clark, 257 N. Y. 132.

Although courts should not encourage efforts to impair the stringency of the time-honored safeguards with which the law has encompassed the fiduciary relation, nevertheless, the acts of this executor-trustee must be examined in the light of the "exculpatory clauses" of this will. This testator has excused, in each instance, any loss not due to bad faith or wilful default. The court does not understand the appellants to claim any bad faith in this case. To excuse a trustee except for a "wilful default" means to excuse him from the consequences of any breach

of trust that he did not intend to commit knowing it to be a breach of trust and from responsibility for any loss that he did not intend to bring about. *New England Trust Co.* v. *Paine,* 317 Mass. 542, 549.

"All that can be required of a trustee to invest, is, that he shall conduct himself faithfully and exercise a sound discretion. He is to observe how men of prudence, discretion and intelligence manage their own affairs, not in regard to speculation, but in regard to the permanent disposition of their funds, considering the probable income, as well as the probable safety of the capital to be invested." *Harvard College* v. *Amory,* 9 Pick. (26 Mass.) 446, 461. In view of the broad powers of sale given the executor in this will, it does not, from the standpoint of fiduciary duty, appear material to distinguish between the sales made by the trust company as executor and as trustee. *State* v. *Hunter,* 73 Conn. 435. The fiduciary standards in either case should be equal under the facts here presented.

In testing the acts of a trust company fiduciary it is proper to consider its special skill in order to determine whether its conduct has measured up to that skill, and to consider whether it had the proper internal organization, and whether that organization functioned properly. 2 Scott, Op. Cit. § 174.1.

After a careful consideration of the facts of this case in the light of the foregoing principles it is my conclusion that the Trust Company did not violate its fiduciary duty in making the sales complained of. I cannot find that the transactions have actually caused any loss to the estate. The appellants' argument converges on the claims that these were "gilt-edged" holdings, and that the trust committee's vote permitted undue latitude as to price and time of sale by subordinates. Why then is not the same claim made as to other securities which might be similarly described and which were sold under similar circumstances? The answer seems to lie in the appellants' preference for these specific stocks. That preference unfortunately clashes with the trust company's effort to establish what it considers a proper diversification of investment. It is true that the sales were made in times of stress and in a low market, but the same low market made it possible to purchase securities to replace those sold at correspondingly low prices. The Trust Company endeavored to meet the wishes of the life tenants as to distribution and at the same time not postpone a proper investment of the fund in the interest of the remaindermen.

The trust committee's votes, being, as they were, unlimited as to time of sale, called for compliance within a reasonable time. The interval which elapsed in this case in view of the circumstances was reasonably within that limit. While the committee vote did not fix the sale price, responsibility for determining it was, by the corporate by-laws, lodged in a responsible officer, and the evidence discloses no dereliction in the performance of his duty. Because his judgment under the circumstances differed from that of the appellants is no ground for criticism. The trust company officers were cognizant of conditions at the time of the sales, their established procedure for reviewing trust requirements was adequate, and it was followed.

The will indicates the testator's realization that his estate perhaps contained assets not proper for a trust fund or in disproportionate amounts. It indicates further that he placed great reliance in his executor and trustee. The Trust Company has done only what he authorized it to do in the exercise of its best judgment. See *Gardner's Appeal*, 81 Conn. 171.

Each appeal is sustained upon the first ground alleged therein, namely, the incorrect application of income, and the executor and trustee are directed to file with the Probate Court their respective accounts corrected accordingly. Other reasons of appeal in each case are overruled.