THE NEW ENGLAND TRUST COMPANY & another, trustees, *vs.* DANIEL J. TRIGGS, trustee, & others.

Middlesex.    April 4, 5, 1956. — June 15, 1956.

Present: QUA, C.J., WILLIAMS, COUNIHAN, & WHITTEMORE, JJ.

*Trust*, Sale by trustee, Distribution, Failure to invest, Exemption of trustee from liability, Deposit of trust funds in commercial department of trust company. *Probate Court*, Stipulation. *Trust Company*, Deposit of trust funds in commercial department.

A sale of securities comprising the major portion of a substantial testamentary trust shortly after the death of the life beneficiary of the trust in order to have in cash amounts then becoming distributable from trust principal free from the risks of fluctuations in the security market, induced partly by a rule of a trust company, which was one of the trustees, to sell securities promptly when distribution seemed imminent and partly by advice of counsel, was within the discretion of the trustees acting under a specific power of sale in the will and was

not premature, although as it happened distribution was delayed for some three years. [329–330]

It was within the discretion of the trustees of a testamentary trust to hold a substantial amount of principal cash awaiting distribution uninvested if and so long as the probabilities indicated to the trustees that they would be able to make distribution promptly; but reasonable prudence required that they invest the cash when it became clearly apparent that there would be a substantial delay in distribution, notwithstanding the low yield on investments which would keep that principal available and undiminished. [331–332]

A clause in a will, providing that "each of my trustees . . . shall be liable for his own receipts, payments and wilful defaults and for nothing else, and one shall not be liable for the other nor for errors of judgment," protected the trustees of a trust under the will against liability to its beneficiaries for an imprudent failure to invest a substantial amount of principal cash awaiting a long delayed distribution of principal. [333]

Under G. L. (Ter. Ed.) c. 172, § 54A, inserted by St. 1935, c. 172, § 2, funds held in the trust department of a trust company awaiting investment or distribution may be deposited in the commercial department of the company even though the company is not sole fiduciary of such funds; and funds of one trust may be mingled with funds of other trusts in a single deposit in the commercial department if the separate interests are properly noted. [333–334]

Upon appeal from a decree of the Probate Court surcharging a trust company and an individual as trustees under a will on the ground that they were guilty of wilful breach of trust or reckless indifference to the interests of the beneficiaries and were not protected by an exculpatory clause in the will, the record disclosed no conscious intent on the part of the trustees in bad faith to have the trust company profit through keeping the proceeds of a sale of trust securities on deposit in its commercial department uninvested for an unreasonably long time awaiting a delayed distribution and did not support the conclusions of the trial judge on which the surcharge was grounded. [335]

A trust company, trustee under a will providing that it should be liable for its "own receipts, payments and wilful defaults and for nothing else," by reason of imprudently keeping money of the trust on deposit in its commercial department long after a time when the money should have been invested, became accountable to the trust, in the circumstances, for the profits which resulted to it from such use of the money after that time or alternatively, at the election of the beneficiaries, for the fair value of its use after that time, where it appeared that such profits and fair value could both be ascertained. [340–341]

It was within the discretion of the Probate Court, after a hearing on contested accounts of trustees under a will at which the issues had been limited by a stipulation, to reopen the hearing and to discharge the stipulation at the request of one of the parties who alleged that until recently he had been ignorant of certain material facts which he then desired to show. [342]

·PETITION in the Probate Court for the county of Middlesex for allowance of accounts of the trustees under the will of Lewis Dewart Apsley, late of Hudson.

The case was heard by *Monahan, J.*

*Robert G. Dodge,* (*Holbrook Campbell* with him,) for the petitioners.

*Daniel J. Triggs,* for the respondents.

WHITTEMORE, J. The petitioners appeal from a decree of the Probate Court allowing their nineteenth through twenty-fourth accounts as modified to surcharge them in the twenty-fourth account with various sums totaling $32,513.38. The principal basis of the surcharge is the judge's finding and ruling of wilful breach of trust in the premature sale of securities to benefit the trustee bank through deposit of the proceeds in its commercial department pending determination of questions arising as to distribution after the death of the life beneficiary.

The appellants are accounting as trustees under paragraph Tenth of the will of Lewis Dewart Apsley which was admitted to probate in 1925. In paragraph Eighth the testator had left his "home place" in the town of Hudson to his wife Abigail and after her death to the town, for use as a home for aged and indigent people. In the Tenth paragraph he bequeathed the sum of $200,000 to his grand-nephew Harriman Apsley Reardon and The New England Trust Company, the appellants, in trust to pay the income to his wife for her life and upon her decease "one hundred thousand ($100,000) of the principal . . . to said Town of Hudson . . . for the support, upkeep and maintenance of . . . [the home given under paragraph Eighth] and the remaining one hundred thousand dollars . . . shall be held and disposed of . . . as follows . . . ." Abigail died April 9, 1948. As applied in the then circumstances the remaining language of paragraph Tenth operated to give one half of the "remaining one hundred thousand dollars" to appointees under the will of Apsley's grandniece, Laura M. Heisler (payment being due to Harold Gordon Lacy, executor of her will, those thus at interest being hereinafter referred to

as "Lacy"), and to leave the other half thereof in the trust, to be held for the benefit of Reardon for his life, with power of appointment in him and gifts over in the event of its nonexercise.

The principal of the trust on Abigail's death was about $165,000. Distribution to Lacy and the town was delayed by doubts as to whether the town was entitled to $100,000 or one half of the principal and whether the town in view of the small size of the gift in relation to the cost of carrying out the designated purpose would take under paragraphs Eighth and Tenth for that purpose or could and would take under a cy pres decree, and because of the consequent proceedings in the Probate Court to resolve these doubts. A decree of distribution was entered on June 25, 1951, providing that the town should receive one half the net principal rather than $100,000, and that the town should administer the fund under an annexed cy pres plan. Distribution under the decree was made for the account of the town on September 19, 1951, and to Lacy on October 3, 1951.

Reardon was an inactive trustee and the management of the trust in all aspects was in the trust department of the trust company. The officers or employees in charge consulted with Reardon from time to time.

Between May 6, 1948, and June 9, 1948, the trustees sold sufficient securities from the principal of the trust to raise a little over $100,000 in cash. The sales were of common stocks, preferred stocks, and bonds of good or excellent investment quality which were easily and promptly marketable at any time under usual conditions. On October 27, 1949, the trustees redeemed at par $28,000 of U. S. Series G 2½'s. The proceeds of the sales and of the redemption were deposited at once in an account in the commercial department of the trust company entitled "The New England Trust Company, Trustee, Executor, Guardian, and so forth," in which other trust funds awaiting investment or distribution had been regularly deposited for a long time and on which no interest was paid. These proceeds were not invested or placed at interest at any time prior to distribution.

At or about the time it was decided to sell the securities to raise $100,000 officers in the trust department discussed among themselves and with Reardon that there would be an allocation or earmarking as follows: the $100,000 proceeds of the sale of securities for the town, as the maximum it might receive, one half the balance (about $32,500) to Lacy in the form of the $28,000 of G bonds together with about $4,500 of the unsold securities, and the balance of the securities to the continuing trust for Reardon. For a time income was distributed accordingly but no allocation was made on the trustees' books or by way of memorandum and the trust fund continued to be accounted for on the books as a single fund. No income was paid to the town prior to the decree herein and no income was paid to or for the account of Lacy after October 13, 1949, or to or for the account of Reardon after April 11, 1950, other than payment of a State tax for his account in March of 1951. The twenty-fourth account showed a balance of income of $3,214.

Under the cy pres plan the payment for account of the town was to the appellee Daniel J. Triggs, Esquire, as trustee to set up a corporation to hold the bequest and to hold also the proceeds of the sale of the real estate devised by paragraph Eighth of the will, for the benefit of the indigent and aged of the town. Mr. Triggs and Lacy contested the accounts and the case was heard under stipulations which provided that the amounts distributed in 1951 were full and proper except as such amounts might be increased (1) by the proportionate part of such amount of the trustees' distribution fee of $1,825.84 as might be disallowed and (2) by adjustments necessary to reflect the liability, if it should be adjudicated, to pay interest on uninvested funds and to pay portions of the net income in fact received after the death of the life tenant.

Nearly three months after the close of the evidence Mr. Triggs moved to be relieved of the stipulation on which the case was heard on the ground that he had until recently been ignorant of the fact that the securities sold and redeemed if held until June 25, 1951, would have been worth $27,314.23

more than was in fact received from the sale and redemption and if held would have yielded income of $23,368.06, and to reopen the hearing to allow these facts to be shown. Later Lacy filed like motions. These were allowed by the probate judge "to prevent a miscarriage of justice."

The will provided, "Each of my trustees and executors, hereinafter named, shall be liable for his own receipts, payments and wilful defaults and for nothing else, and one shall not be liable for the other nor for errors of judgment."

The probate judge found and ruled that the trust company consciously violated the trust in order to benefit itself, that the trustees in conscious violation of their trust duties sold the securities and redeemed the G bonds with the intention of converting them, that they did convert them and were guilty of wilful defaults or, if that conclusion is not warranted, were guilty of reckless indifference to the interests of the beneficiaries and were in either event not protected by the exculpatory clause of the will. The decree entered as of February 3, 1954, charged the trustees with three quarters (that is, the town's and Lacy's shares) of the increase in sale and redemption prices which would have been realized and three quarters of the additional income which would have been received if the securities and G bonds had been held to June 25, 1951. The decree allowed interest on these items at six per cent from September 19, 1951, to February 3, 1954. The decree also allocated three quarters of the income actually received by the trustees, as payable to Mr. Triggs and Lacy in the correct proportions, and charged the trustees with $350.15 overpayment of income to Reardon.

There was no serious conflict in the testimony or exhibits, all of which are before us. The judge's findings include the salient facts as testified, with his conclusions therefrom.

THE CASE APART FROM THE EFFECT OF DEPOSITING AND
    HOLDING TRUST CASH IN THE TRUST COMPANY'S
    COMMERCIAL DEPARTMENT.

The sale of securities after Abigail's death in 1948 was within the trustees' power. Whether or not power of sale

would be implied from the purposes of the trust (see Scott, Trusts, § 190.2) the will here gave the trustees express authority to sell.

A decision to remove from the risks of market fluctuations the amounts needed for the payments in distribution of principal which had come due on the death of the life tenant was within the reasonable discretion of the trustees even though a decision not to sell in the particular circumstances would have been also within the discretion of the trustees and perhaps a better one. *McCoole* v. *Mackintosh*, 267 Mass. 86. *Creed* v. *McAleer*, 275 Mass. 353, 357–358. *North Adams National Bank* v. *Curtiss*, 278 Mass. 471, 480. *Rothwell* v. *Rothwell*, 283 Mass. 563, 570–571.

The evidence shows that the trustees made the sales of securities and redeemed the G bonds in part because of the application of a rule of the trust department, which was the department charged with the supervision and control of the administration of the trusts by the trust company, requiring this to be done in such situations, and in part because of contemporary consideration of the matter, with counsel, by the vice-president in charge of the trust department.

The finding of the probate judge that the account administrator in determining to sell and in selling the securities acted not on the advice of counsel but rather on the rule of the trust committee can be supported by accepting a part only of the relevant testimony, but the findings that "The advice of counsel for the trust company had nothing to do with the decision to sell" and that "It was sought and obtained by the trustees for the sole purpose of getting his opinion as to whether or not the share of the bequest to the town was $100,000 or one half the trust estate" overlook the significance of the advice which counsel testified he gave, which the judge has not found was not given and which was confirmed in writing and by other testimony.

Counsel for the trust company testified that on April 12, 1948, he talked with the then vice-president in charge of the trust department and an employee of that department,

that the vice-president asked "if the bank had a duty to protect the Lacy interests and Mr. Reardon in the event $100,000 was declared payable to the town of Hudson," and that counsel said that he "thought that they did have such a duty if they felt that securities were going to decline, because any loss . . . would necessarily come out of the Reardon interests and the Lacy interests in view of the fact that $100[,000] was a fixed amount and would not change with a fluctuation in the value of the securities." The confirming letter is dated September 28, 1948. In it the attorney wrote to the trust company in part as follows: "My feeling is that $100,000 should be converted into cash or into government bonds which are readily marketable and that the balance should be distributed. . . . Possibly the liquidation as suggested has been done. I talked or wrote about the possibility some time ago."

This advice informed the head of the trust department in effect that there was no reason why the usual rule to sell should not be followed in this situation. That the vice-president may not have shared all aspects of his consideration of the matter with the account administrator prior to the time when the latter, not receiving contrary instruction, acted pursuant to the rule, would not show that the advice had nothing to do with the sale pursuant to the rule.

It was within the reasonable discretion of the trustees to hold in cash the proceeds of the sale of the securities in May, 1948, and of the redemption of the G bonds in October, 1949, if and so long as the probabilities indicated prompt distribution. There is force in the contention that the trustees should have realized in May, 1948, that the greater likelihood was for a substantial delay in distribution since a petition for instructions, formulation and approval of a cy pres plan, and appeals were possible developments. But the issues were not complicated nor was there indication of unreasonableness or contentiousness among interested parties and the possibility existed of prompt agreement subject to pro forma Probate Court approval. We do not think it can be said therefore that it was not reasonably prudent action,

the sales having been made, to hold the funds uninvested for a time after May, 1948, pending some indication of the probable course of events. By the end of September, 1948, however, it was established beyond doubt that there would be a delay of more than six months. At that time we think reasonable prudence required that the trustees put their cash at work. On September 27, 1948, the town of Hudson held a special meeting to consider what to do about the gift to it and then appointed a committee to investigate and report at the annual town meeting in March, 1949. The trust company was told by its counsel of the action of the September meeting. At best, distribution could not occur until sometime after the March meeting. That the yield would have been small on available short term notes or other investments which would assure the availability of undiminished principal, did not justify retaining over $100,000 uninvested for the interim period.

At other dates thereafter there were clear indications that delays of at least several months would be inevitable. On April 27, 1949, after the annual town meeting in Hudson, the trustees filed a petition for instructions. On December 9, 1949, the town filed a petition in equity seeking a decree that the home place be sold and that it be allowed to receive the proceeds and the legacy under paragraph Tenth under a cy pres plan. This petition was dismissed on June 15, 1950, on the plea by a guardian ad litem of another suit pending, and an appeal was taken. On November 28, 1950, the trustees' petition was referred to Mr. Triggs as master. Doubtless the officers of the trust company, as they and counsel testified, prior to the September, 1948, town meeting and throughout the period after the March, 1949, town meeting expected that through agreement or court action or both the relatively simple problems would be resolved shortly and further delays avoided. But the test is of course not the good faith of the trustees. We think that on and after October 1, 1948, the trustees were not warranted in acting as though distribution time was close at hand. As a vice-president of the trust company testified in respect of

the propriety of investment after the September, 1948, town meeting, "It looks as if it should have been done." If it had been done then the proceeds of the 1948 sales should and undoubtedly would have remained at interest until after the entry of the decree of June, 1951, which told the trustees what to do with them. The proceeds of the sales of the G bonds should have been placed at interest upon receipt and kept at interest thereafter.

Whether or not this withholding of capital funds from earning is to be called a breach of trust for any purpose, it is clear that the exculpatory clause protects the trustees against liability for so doing. *New England Trust Co.* v. *Paine*, 317 Mass. 542, 548–550, and cases cited, reaffirmed 320 Mass. 482. Therefore apart from the effect of the deposit and retention of the funds in the commercial department of the trust company there was no basis for the principal items of surcharge against the trustees.

### THE EFFECT OF THE DEPOSIT OF THE TRUST FUNDS IN THE COMMERCIAL DEPARTMENT.

The statute (G. L. [Ter. Ed.] c. 172, § 54A,[1] inserted by St. 1935, c. 172, § 2) and the by-laws of the trust company permit this, provided the requisite security is deposited.

There is nothing in the appellees' contention that only funds held by the trust company as sole fiduciary could be so deposited. These were "funds held in the trust department of . . . [a] trust company . . . awaiting investment or distribution" within the precise wording of the statute. The statute plainly was designed to qualify the rule declared in *Morrison* v. *Lawrence Trust Co.* 283 Mass. 236, 239 (1933), that it was a gross breach of duty for a trust company to deposit fiduciary funds in its commercial de-

---

[1] "Notwithstanding any provision of section fifty-four, funds held in the trust department of any trust company, whether or not incorporated as such, awaiting investment or distribution may be deposited in its commercial department if such corporation shall first transfer to its trust department to be held as security therefor bonds, notes, bills and certificates of indebtedness of the United States or of this commonwealth, or any of them, of an aggregate value of not less in amount than funds so deposited, and shall at all times maintain the value of such security at such amount."

partment and thus mingle trust assets with its own business funds, and to make such mingling proper provided the required security is maintained. All considerations of convenience and incidental advantage which may have suggested the enactment of the statute (see Uniform Trusts Act, 9A U. L. A., page 335, § (3), Commissioners' Prefatory Note) are equally applicable in every case where the trust company has funds in its trust department awaiting investment or distribution regardless of whether there are cofiduciaries, and no substantive contrary arguments apply more forcefully in the one case than in the other.

There was no impropriety in depositing the funds, with other trust funds awaiting investment or distribution, in a single fiduciary account, where, as was the case here, the separate interests of the several fiduciary accounts were noted at all times both in the deposit and in the securities which fully secured all the funds. See *French* v. *Hall*, 198 Mass. 147; *Springfield Safe Deposit & Trust Co.* v. *First Unitarian Society*, 293 Mass. 480; Scott, Trusts, § 179.2; Restatement: Trusts, § 179, comment c; Restatement: Agency, § 72, comment e; *American Legion Post No. 90 of Mamaroneck* v. *First National Bank & Trust Co.* 113 Fed. (2d) 868, 873.

There is nothing in the point, stressed against the appellants, that upon deposit the specific money loses its identity as property of the particular trust. This is true in the case of any deposit in a bank. All trustees appropriately deposit their uninvested cash in a bank and thus keep "cash" in the form of an indebtedness from the bank. *Worcester Bank & Trust Co.* v. *Nordblom*, 285 Mass. 22, 27.

A trustee bank which exercises its statutory right to hold trust funds in its commercial department accepts, however, the increased responsibilities which the circumstances impose. The permission of the statute to deposit in the commercial department funds awaiting distribution or investment does not remove the factors which support the arguments advanced for the contrary rule. These include that there may be "a temptation to leave the money

on deposit for an unnecessarily long time, since the bank is making a profit by lending the money at a greater rate of interest than it pays on the account, if indeed any interest at all is paid on such accounts." Scott, Trusts, § 170.18, page 892. And see Restatement: Trusts (proposed final draft 1935), § 165, comment m, discussed in Scott, Trusts (ibid). If, in the afterlook, the time of withholding of funds from investment appears too long, questions of the trustee's motive will inevitably press themselves forward, as has happened here. See *Re Waterman's Will Trusts*, [1952] 2 All E. R. 1054.

The outcome, judged with the benefit of hindsight, is startling, and, if planned for a known or anticipated two and one half or three year period, would be indefensible. Upon a careful examination, however, of the entire record, and after giving due weight to the findings of the judge (*Witherington* v. *Nickerson*, 256 Mass. 351, 354; *Corkery* v. *Dorsey*, 223 Mass. 97, 100), it is our conclusion that there was not at any time conscious intent to have the bank profit through overlong withholding of cash from investment, an expectation of a delay of more than about six months, or a recognition of the implications of such delay as was known or anticipated. And we conclude also, therefore, that there was not either the bad faith or intentional and reckless indifference to the rights of beneficiaries which would be the basis for sustaining, in the main, the surcharges imposed below, assuming we are to accept the rule of Restatement: Trusts, § 222 (2), quoted in *New England Trust Co.* v. *Paine*, 317 Mass. 542, 550–551. Inferences of undue preoccupation with one aspect of protection of the trustees against attack on their accounts, and with following set practices, would in our opinion be justified, but their force is counter to a conclusion of affirmative misconduct.

The fact that it was the invariable practice to deposit cash in the fiduciary account in the commercial department is not evidence of a general intent to keep it there an unreasonably long time. The existence of a rule to sell promptly

preparatory for distribution does not evidence such an intention. There is no evidence or implication of a common purpose in the adoption of these separate rules. The only testimony as to why the rule to sell promptly was adopted confirms the strong implication from the fact itself, that it was done to assure adherence to proper trust administration. "[T]he general rule of the trust committee is, because we can't predict the market, and in order to safeguard the remainder interests in the event of a declining market — that is a reason for converting the assets to cash."

That the officers of the trust company, in determining on a policy of depositing in the commercial department trust funds awaiting investment or distribution, may have had in mind that it would be profitable to the bank thus to increase its deposits, is no basis for concluding that generally, or in a particular case, they would intend that the deposits be kept longer than proper trust practice, as determined in the trust department, would indicate. The evidence showed that the trust department had the full responsibility in respect of the trust accounts. An important concern of the officers and employees in charge and at work in that department would naturally be to do a good job in the business of managing trusts and to bring advantage to the trust company and credit to themselves in that way. We deem it greatly more probable that any effort of those in charge of the commercial department, or in over-all charge of the trust company, to increase that aspect of the bank's business and profits at the expense of proper and prudent management of the trusts would be vigorously resisted in the trust department, than that any decision would consciously be made there, or accepted there, to serve that end. We find no evidence that there was any such effort.

Indeed the implications, from any such derogation of the basic fundamentals of proper trust administration, of great harm to the successful conduct of the large trust business which it is shown that the trust company has, are in our view so obvious and compelling as effectively to negate

such inferences of intentiónal profit making at trust expense as may be suggested by the outcome here and some of the circumstances.

The only direct testimony as to intent was from the vice-president in charge of the trust department at the time of the hearing who testified that the securities were not sold for the purpose of providing funds to be used by the trust company to make money.

We do not find in any of the talk of the account administrator with Reardon evidence of an intention to overpersuade or "appease" Reardon. There was no reason why the Lacy share in the smaller amount which was provided by the proposed allocation of $100,000 to the town's account should not have been paid to Lacy. Indeed it was testified that payment was tendered within a few months after Mrs. Apsley's death. It would perhaps additionally not have been inappropriate, at a time when only a short period before distribution was contemplated, to set up the $100,000 separately for the account of the town (and for Lacy and Reardon if it should develop that the town's share was only one half of the entire fund), and to continue to hold the Reardon share in trust substantially as counsel for the bank advised in his letter of September 28, 1948. We think, however, that the propriety of such allocations for any substantial period, even with the $100,000 fund invested, would be in doubt in the absence of assents of affected beneficiaries. To serve the stated purpose it would have been necessary to invest the $100,000 fund in nonfluctuating low yield securities. The allocation was proposed in part to protect the beneficial interests in the remainder held for Reardon for his life and would have left higher yield securities in the part allocated to his continuing trust. The account administrator by his own testimony was, it is true, contemplating, at least as a possibility, a delay of as much as six months. We do not find, however, that in making the suggestion he was proposing or seeking to get Reardon to agree to anything which he or others for

the trust company then thought was unreasonable or not proper trust administration.

The account administrator's answer (as testified to by Reardon) to Reardon's query in May, 1948, in respect of investing in bonds or savings deposits (namely that there might be a drop in the bond market and it would be better to follow the accepted practice of liquidating securities and depositing the cash), and his later assurance that the procedure being followed was correct, although Lacy's counsel had questioned it to Reardon, while they may suggest some fixity of purpose to get and hold cash, and a failure to take note of the obvious availability of short term notes to yield a small return in the interim period, are nevertheless consistent with a junior executive's preoccupation with following the letter of the applicable rule, and obtaining the cotrustee's assent to so doing.

The contemporary attitude of all concerned is confirmed not only by the letter from counsel of September 28, 1948, but also by the fact that according to the preliminary statement of counsel for Lacy (some of the facts were thus given to the judge), when his clients "were notified there was this money on hand that was just cash," and that they "could have a distribution if they wanted to," they said "there was no reason why they should hurry the distribution; wait until all questions were decided, or something to that effect. But nothing was ever said . . . that anybody was going to make any money out of that cash fund. . . . The inference was that it was to lay idle upon the theory that the fight with the town of Hudson would be resolved very shortly."

In the spring of 1949, after the annual town meeting in Hudson, Reardon asked the vice-president of the trust company in charge of the investment division if their position in keeping cash was all right and the latter replied, as Reardon testified, that it had been drawn out longer than he anticipated, but he thought that they would probably get action before the court recessed in June and that there would not be any reason to make a change in the circumstances. The account administrator testified that during

the interim period "It bothered us as it went on . . . for the time that had gone past" but the future did not bother them "because we always thought it was going to be settled soon."

We deem it unnecessary to comment on other parts of the testimony bearing on the trust company's motive, other than to say that the failure to tell Lacy that the cash was in the trust company's commercial department is fully as consistent with an absence of any thought that this would involve a loyalty question as time passed, as with an improper intent. We think it shows the former.

The failure to invest, to reëxamine the proposal for allocations in the developing circumstances and to realize the propriety or necessity, in view of the long delay, of treating all earnings as earnings of the entire trust, while they are failures to do what the situation required, do not, we think, show a plan or intent to have the trust company profit at the trust expense.

The evidence does not justify a finding of bad faith or reckless indifference by Reardon. He was assured that the proposed allocations were proper and that the matter had been considered by counsel. The decision of what should be done was made by the active cotrustee. The proposals were not intended as the price of Reardon's acquiescence in a sale for any purpose other than proper trust administration as it was then conceived, and they were not understood or accepted by Reardon as such price. He would of course be equally accountable for the failure to invest, if there were such accountability apart from the exculpatory clause, but as the inactive trustee it is apparent that he gave no thought or attention to carrying out the separation of the three funds as suggested to him or to the need of reëxamining that question, and we do not find conscious impropriety in his receipt for a time of the income from the share which he understood was for his benefit under the continuing trust. The decree below, with which we are in accord in this respect, provides that all the beneficiaries share proportionately in all income. There was no conversion of any part of the trust fund by either trustee.

What happened shows plainly a failure by the trust company, as managing trustee, to bring into focus the special circumstances applicable to this account as they developed after the first consultation with counsel in the spring of 1948. In particular there was a failure to appreciate and meet the special responsibility entailed in so holding a large sum that the trust company and not the trust would have incidental profit from its use.

The rule of Restatement: Trusts, § 222 (2), which was assumed without decision in *New England Trust Co.* v. *Paine,* 317 Mass. 542, 550–551, states, additionally to that which we have referred to earlier herein, that "A provision in the trust instrument is not effective to relieve the trustee of liability . . . for any profit which the trustee has derived from a breach of trust." Whether or not the failure to invest would be a "breach of trust" apart from the aspect of profit to the trustee, we hold that there is liability here to account for the profits which resulted from such withholding, or alternatively for the fair value of the use of the money, after the date when the money should have been invested, namely, October 1, 1948, as to proceeds of sale and November 1, 1949, as to proceeds of redemption of G bonds. *Ball* v. *Hopkins,* 268 Mass. 260, 269, and cases cited. *McIntire* v. *Mower,* 204 Mass. 233, 237–238. *Bradbury* v. *Birchmore,* 117 Mass. 569, 580–581. Scott, Trusts, § 170.17.

The language of the exculpatory clause does not in terms excuse the trustee from accounting for profits which accrue to it; indeed the reference to receipts could be construed to require such accounting ("Each of my trustees . . . shall be liable for *his own receipts,* payments and wilful defaults and for nothing else" [emphasis added]) and public policy would stand against a construction which would permit such profits to be retained — certainly so in the absence of express and clear language which would in effect make the trustee to that extent a beneficiary of the trust. The statute which permits trust deposits with a commercial department does not show a public policy to allow the trust company to

retain the incidental profit from an unreasonably long withholding from investment or distribution.

Here it appears that the trustee made a profit from the use of the subject funds along with its other commercial deposits. In a particular case it could of course be that the trustee sustained no profit or incurred a loss. What the trustee had, which belonged to the trust, was the opportunity for the profitable use of the fund. We think it would be contrary to public policy to allow the trustee to enjoy this with an obligation to pay compensation left solely dependent upon an outcome profitable to the trustee. What the trustee would have had to pay for the like use of a like amount from other sources is a measure of the advantage to the trustee. This is "in hand" in the sense that it would otherwise have been paid out and is substantively in this respect like a receipt from or profit on the trust fund and for this reason the trustee should account alternatively at the election of the beneficiaries affected for the fair value of the use of the money for the same period.[1] Except for the exculpatory clause it is clear that the trustee using trust funds for its own purposes would be liable not only "for all the profits arising from such use" but also "for the principal and interest, in case of loss." *Ball* v. *Hopkins*, 268 Mass. 260, 269. *Bowen* v. *Richardson*, 133 Mass. 293. But imposing an obligation to pay the interest at the statutory rate for legal defaults, regardless of actual gain or advantage to the trustee, partakes of imposing liability of the kind which the exculpatory clause has excused. We do not say that in other circumstances it may not be appropriate, but where as here it appears that the actual gain and equivalent advantage to the trustee apart from gain can both be ascertained and were incidental and not specifically intended, we confine the measure of accountability to these categories.

[1] In this connection it is to be noticed that as of September 30, 1948, the deposit was the equivalent of a time deposit for at least six months and not in the category of usual checking account deposits. Perhaps the then currently prevailing interest rate on six months' time deposits would be evidence of fair value — not to suggest that there may not be other appropriate evidence.

Assuming that the apportioned profits will be elected in this case, there should be ascertained the rate of profits that in fact prevailed in the periods from October 1, 1948, and November 1, 1949, to June 25, 1951. The prevailing rate of profit for the current year, or other period if profits are customarily computed otherwise than yearly, shall be deemed to have prevailed in corresponding parts of the accounting period. The allocated profits thus computed as accruing to the trust at the end of each profit reckoning period within the accounting period shall be deemed added to the principal fund on deposit from that time forward. The trustees' accounts should be restated to include in income the allocated profits as a receipt from the trust company, and the total income is to be distributed among the several beneficiaries including Reardon. If, alternatively, the fair value of the use of the fund is the elected measure of accountability, suitable similar computations, accounting, and payments are to be made, with the interest at whatever rate is found to represent the fair value of the use of the money, compounded annually to June 25, 1951. *Boynton* v. *Dyer*, 18 Pick. 1, 6–8. *Forbes* v. *Ware*, 172 Mass. 306, 308–310. In either case interest at the legal rate is to be paid by the trust company from September 19, 1951, the date when distribution began under the decree of June 25, 1951, on the total amounts payable by it as allocated profits or fair value of the use of the fund.

It was within the discretion of the probate judge to reopen the hearing and discharge the stipulation which limited the issues and we cannot say that his discretion was improperly exercised. *Wells* v. *Wells*, 209 Mass. 282, 291. *Ambrozewicz* v. *Lane*, 283 Mass. 141. *O'Reilly* v. *O'Reilly*, 293 Mass. 332. *Paper Trucking Co.* v. *Russo*, 281 Mass. 209. *Capano* v. *Melchionno*, 297 Mass. 1, 15. *Malone* v. *Bianchi*, 318 Mass. 179, 182–183.

There is no basis for charging the trustees with what would have been the cash equivalent of the securities if they had been held until distribution under the decree of June 25, 1951, or what they would have yielded if held.

Except for the profit or fair value of the use to the trust company, and the interest thereon from September, 1951, herein provided for, and the division among all the beneficiaries of all the income up to distribution date which was contemplated by the decree below, the accounts are to be allowed as submitted by the trustees.

The final decree is reversed. Further hearing is to be had in the Probate Court for the purpose only of ascertaining the net profits of the commercial department in the relevant periods, and, for alternative use, the fair value of the use of the deposited funds, and a new final decree is to be entered in accordance herewith.

*So ordered.*