Boston Safe Deposit and Trust Company & another,[1] trustees, *vs.* E. G. Boone & another,[2] executors.

Norfolk. December 10, 1985. — February 24, 1986.

Present: Perretta, Kaplan, & Fine, JJ.

*Trust,* Negligence of trustee, Personal liability of trustee, Distribution, Exemption of trustee from liability.

A trustee who, by reason of pending litigation challenging the validity of the life tenant's exercise of her power of appointment, delayed liquidation of securities held by the trust was not chargeable with losses due to a drop in the stock market which occurred while the litigation was pending, where the trustee was holding prime stocks, where considerable delay of distribution was inevitable and where, in the circumstances, the trustee could not fairly be held for failing to predict the movement of stock prices. [641-643]

This court expressed the opinion that an exculpatory clause in a trust instrument providing that the trustee would not be liable for any act or omission in the absence of wilful default or bad faith was effective according to its terms, and not against public policy, with respect to losses sustained by the trust as a result of a drop in the stock market which occurred while the trustee delayed distribution pending the resolution of litigation challenging the validity of the life tenant's exercise of her power of appointment. [644]

On appeal from a Probate Court judgment that an exculpatory clause in a trust instrument relieved the trustee from liability for losses resulting from a drop in the stock market while the trustee delayed distribution, the appellant was not entitled for the first time to argue the point that one who drafts a will in which he is named as a fiduciary should not include an exculpatory clause that might apply to himself, without first advising the testator of the effect of the provision. [644]

Petition for probate of a will filed in the Probate Court for the county of Norfolk on December 5, 1968.

Proceedings relating to trustees' accounts were heard by *Robert M. Ford,* J.

---

[1] Clifford H. Byrnes.

[2] First National Bank of Venice, Florida.

*Ronald F. Kehoe* (*Linda E. Meyer* with him) for the defendants.

*Richard W. Renehan* (*Charles C. Ames* with him) for the plaintiffs.

KAPLAN, J. E. G. Boone and First National Bank of Venice, Florida, executors of the will of Bernice A. Pearson, objected to the seven accounts of Boston Safe Deposit and Trust Company (Boston Safe) and Clifford H. Byrnes, trustees of a marital deduction trust in favor of Mrs. Pearson. The ground of objection was that Boston Safe[3] delayed unduly in liquidating the trust, with the ensuing market losses falling upon Mrs. Pearson's estate, which she, under a testamentary power to appoint the remainder of the marital trust, had named as a residuary taker after satisfaction of her various bequests. The matter was tried in much detail. A judge of the Probate Court, upon findings of fact and conclusions of law, held that the trustee had committed no breach of trust. He held also that the trustee was protected against liability by certain provisions of the will of the husband, William T. Pearson, setting up the trust, notably an "exculpatory" clause. Mrs. Pearson's executors appeal.

1. Mr. Pearson died on November 25, 1968. Clause "Third" of his will created the marital trust and gave Mrs. Pearson a general power to appoint by her will, with a gift over to Brown University if she should fail to appoint or to appoint effectively. The trust was funded on June 11, 1970, with marketable securities and some cash totalling $692,580; it was finally funded on March 29, 1973, with additional cash of $72,917. On May 17, 1972, Mrs. Pearson died. A codicil to her will (dated November 10, 1971) appointed pecuniary legacies in varying amounts totalling $750,000 to fourteen named charities; $22,000 for payment of certain death taxes; and any balance of the trust to her own estate.[4] On August 14, 1972, the trust

---

[3] It is understood that the claim of surcharge is directed against Boston Safe, not against the cotrustee Byrnes, who died in January, 1974. For that reason, and because Boston Safe was the active trustee engaged in management, we speak hereafter of Boston Safe as the trustee.

[4] A small gift of shares of stock to certain persons was refused by them.

assets, as reported by the trustee to Mrs. Pearson's executors, stood at a value of $1,026,284.

Around this time, it appeared that Brown University might claim that, by reason of her mental incapacity or of undue influence exerted upon her at the time she made the codicil, Mrs. Pearson had not effectively appointed; and on October 19, 1972, counsel to the University asked Boston Safe to withhold distribution of the trust assets pending the university's further investigation. By May 29, 1973, the university had determined to press its claim, as indicated by counsel's letter of that date to the trustee. Accordingly, the trustee on June 4, 1973, petitioned the Probate Court to adjudicate the university's claim, joining as defendants the university and the charities.

That distribution had to be postponed did not mean necessarily that liquidation should be deferred, but that was the course taken by Boston Safe. It treated the trust assets for a time according to its usual procedure or routine. Trust officers Robert C. Adams and Kenneth J. Robinson (respectively dealing with "administration" and "investment") were in primary charge of the account. They consulted with investment review groups at intervals of about six months. The list of securities, largely common stocks, appeared very sound ("blue chips," according to one witness). The group decisions taken on August 22, 1972, March 20, 1973, September 18, 1973, and March 13, 1974, were to make "no change." During this period, the trust assets, with one minor decline around December, 1973, remained at or near the million dollar mark.[5] From April through July, 1974, however, the stock market trended downward, and there was a severe fall in August (the oil embargo, among other things, was at work). About March 1, the trust assets had a value of $997,500; by August 12, they were worth around $799,000; on August 28, $711,500 (for the first time a figure below the aggregate of the cash legacies); on September 27, $675,000.

---

[5] On September 17, 1973, the value was $1,035,100, but it fell to $957,600 by December 3, 1973. This was the relatively minor interim decline. It was substantially overcome by March, 1974.

Boston Safe was not insensitive to what was happening, nor were those advising the beneficiaries. Until about August, 1974, neither the charities nor the executors had expressed any wish for liquidation of the trust. On August 15, however, Boston Safe was responding to a troubled inquiry from an attorney for the executors and for certain of the charities and mentioning a value at August 14 of $780,000. The trust officer Robinson evidently undertook to have the account reviewed completely with advice of counsel as to whether it would be prudent to liquidate. On September 4 the question was renewed with counsel, without decision. At a meeting on September 18, concerned chiefly with the possible settlement of Brown University's claim, an attorney representing beneficiaries spoke of seeking at some stage to surcharge the trustee for failing to liquidate at the death of Mrs. Pearson. On September 30 the investment review group discussed the "potential" sale of the securities or the "possibility" of distributing in kind, but decided to take no action, that is, decided to continue to hold. About this date, the trustee improved upon its customary surveillance of the portfolio by making daily valuations.

In the next few months the stock market rebounded and at the same time the prospects improved for settling the university's claim. By February 5, 1975, with settlement pretty well assured, the trustee liquidated the trust assets at $797,146 (upon distribution, the figure apparently was $816,338). The settlement agreement, executed by all concerned on June 30, 1975, and court approved on July 24, 1975, provided that in release of the claim of Brown University it would be paid $91,000 from the aggregate otherwise distributable to the charities; counsel fees and expenses of some $43,000 were also charged against the charities.

After proportionate distribution to the charities, no balance was available for Mrs. Pearson's executors. Objecting to the trustee's accounts, the executors sought to surcharge the trustee in the amount they would have received if liquidation had occurred on August 14, 1972, plus the amount of certain trustee's fees (calculated by the executors as $298,290 plus $41,768).

2. Boston Safe recognized, as a general proposition, that upon the falling in of a trust (as upon the death of a life tenant like Mrs. Pearson), a trustee should consider itself — in the words of one of the trust officers — a "stakeholder" with some obligation to "back off to a conservative position." The law is in agreement. See *Rothwell* v. *Rothwell,* 283 Mass. 563, 570 (1933). Cf. *Brine* v. *Paine Webber, Jackson & Curtis, Inc.,* 745 F.2d 100, 104 (1st Cir. 1984). Usually the "stakeholder" will discharge its duty by liquidating and distributing with reasonable promptness. There is, however, no iron or absolute duty to do so, and prudence may indeed suggest (or even demand) that liquidation be deferred. Compare *New England Trust Co.* v. *Triggs,* 334 Mass. 324, 330 (1956), with *Bowker* v. *Pierce,* 130 Mass. 262, 264 (1881). The question of timing a liquidation may become difficult where distribution must be postponed because of the pendency for an indeterminate period of litigation regarding the interpretation of the trust instrument, ascertainment of the correct beneficiaries, or the like. See *Creed* v. *McAleer,* 275 Mass. 353, 358 (1931). Cf. *First Natl. Bank* v. *Truesdale Hosp.,* 288 Mass. 35, 46 (1934). Where distribution will necessarily be long delayed, common sense tells us that a trustee can properly consider keeping the corpus of the trust reasonably productive meanwhile. See Restatement (Second) of Trusts § 344 comment c (1959); 4 Scott, Trusts § 344, at 2736 (3d ed. 1967). One can well imagine a claim of surcharge if a trustee in these circumstances liquidates pre-cipitately, say upon an obviously depressed market. Compare *New England Trust Co.* v. *Triggs,* 334 Mass. at 330, where, however, the situation was not quite so aggravated.

In the present case the trustee at the time of Mrs. Pearson's death, and throughout, was holding a list of prime stocks. Considerable delay of distribution was inevitable. The stock market initially and over many months could be described as a bull market, and, although bull might change to bear, the prospect appeared remote, and a motive not to forgo the benefits of the market could be thought legitimate. The trustee could keep in mind the dollar requirements for the payment of cash legacies, if the charities should succeed, but also the probable

wishes of the university for a distribution in kind, if the petition for instructions were answered otherwise. When the stock market faltered somewhat between September and December, 1973 (see n.5), the trustee believed the market would correct itself, and it did. The trustee did not foresee the slide from April through July, 1974, or the deep decline in August. It still considered that the best policy was to hang on, and the market did recover to some extent by February, 1975, when, settlement of the university's claim being in sight, the assets were liquidated.[6]

Neither the record nor common experience suggests that the trustee could fairly be held for failing to predict the movement of stock prices after April, 1974, see *Creed* v. *McAleer,* 275 Mass. at 358, and in this period it faced the problem of what to do on a declining market. As the court said in *Kimball* v. *Whitney,* 233 Mass. 321, 334 (1919), "The decision of the question whether to sell an investment of trust funds on a falling market is a perplexing one." See also *New England Trust Co.* v. *Paine,* 317 Mass. 542, 555 (1945). When the slump comes, it often appears too late to sell; even then it may not be unreasonable to expect, and count upon, an upturn. See *Crowell & Thurlow S.S. Co.* v. *Crowell,* 280 Mass. 343, 361 (1932). In consideration of the vagaries of the market, our courts have not been harsh about charging trustees for investment judgments which, on reflection after the event, appear to have been mistaken, see 3 Newhall, Settlement of Estates and Fiduciary Law in Massachusetts § 417, at 22 (4th ed. 1958), although an extreme case could warrant surcharge. See *McCoole* v. *Mackintosh,* 267 Mass. 86, 97 (1929).[7]

---

[6] The judge pointed out in his findings that during the whole term of the marital deduction trust, from its original funding to final distribution, the assets went from $765,497 ($692,580 plus $72,917, as indicated above) to $816,338.

[7] The trustee contends that certain provisions of Mr. Pearson's will themselves authorized retention of the securities, regardless of market conditions. We do not enter upon this question except to say that the trustee's interpretation of the language appears strained.

It will be agreed that Boston Safe in its management of the instant trust did not display the market skills of a John Maynard Keynes. Mr. Pearson, a stockbroker himself, would not be astonished to learn that Robinson was simultaneously the primary investment officer for as many as 250 accounts. In these circumstances, Keynes himself might not have been able to provide a Keynesian service.[8] On the whole we agree with the judge that, although perhaps short of excellence, Boston Safe's service was not imprudent so as to call for surcharge.

What has been discussed, elaborating on the judge's findings and conclusions, answers the tenor of the executors' objections. We need to add that we find no merit in the executors' argument that the judge overlooked the brief testimony of their expert that the trustee's conduct did not comport with the practice of local fiduciaries in like situations.[9] The testimony was little more than an insistence that liquidation should have come earlier. Boston Safe had no express fixed rule about liquidation but was conscious of its duty and of the factors that should enter into prudent decision. If, perchance, the local practice was a rigid one, the practice would offend the law. The executors criticize the trustee for failing to solicit the wishes of the beneficiaries about liquidation (their expert also commented on this matter). Better liaison might have been helpful. But there was some communication, and the beneficiaries were represented by attorneys who might be expected to become vocal on proper occasions; in fact some did speak up. We should not minimize the embarrassment that could arise from soliciting opinions from the fifteen interests involved, who might differ among themselves; and the trustee's duty would not in any event be defined by a majority vote.

[8] It is instructive that even Keynes could falter. In Spring, 1920, he was speculating on margin against the German mark. His general aim was right but his timing was off, and he suffered severe losses. Harrod, The Life of John Maynard Keynes 295-297 (1963).

[9] Except in one particular, the executors did not claim that the judge's findings were clearly erroneous; they were rather claiming errors of omission. The particular claimed error relates to finding 27(b), which sets out one of the considerations that led the trustee to retain the securities. We think the finding was supported; it might have been more comprehensive.

3. Mr. Pearson's will provided: "No one of them [executors and trustees] shall be liable for any act or omission except for his or its own wilful default or bad faith." In the light of the discussion above, we are not required to deal with the effect of this "exculpatory" clause. However, we note our agreement with the judge that the trustee's behavior cannot in any view be properly characterized as involving "wilful default" or "bad faith." See *Warren* v. *Pazolt,* 203 Mass. 328, 347 (1909), and *Anderson* v. *Bean,* 272 Mass. 432, 447 (1930) (wilful default); *Spiegel* v. *Beacon Participations, Inc.,* 297 Mass. 398, 417 (1937) (bad faith). See also *Peterson* v. *Hopson,* 306 Mass. 597, 609-610 (1940); *Hartford Acc. & Indem. Co.* v. *Millis Roofing & Sheet Metal, Inc.,* 11 Mass. App. Ct. 998, 999-1000 (1981); Bogert, Trusts and Trustees § 542 (2d ed. 1978). The judge's evident view that the clause was effective according to its terms, and not against public policy, is supported by past decisions. See *New England Trust Co.* v. *Paine,* 317 Mass. at 550; *Dill* v. *Boston Safe Deposit & Trust Co.,* 343 Mass. 97, 100 (1961).

The executors attempt on this appeal for the first time to argue the point that one who drafts a will in which he is named as a fiduciary should not include an exculpatory clause that might apply to himself, without first advising the testator specifically of the effect of the provision. The executors assert it has not been shown that the cotrustee Byrnes was free of fault in this respect. Without attempting to delineate the scope of the rule which the executors seek to invoke, see *Barnum* v. *Fay,* 320 Mass. 177, 181 (1946),[10] we say that any claimed delict of the cotrustee should have been brought forward by the executors at an earlier stage. We may pass by the question whether or in what circumstances an infraction by one trustee might deprive a fellow trustee of the protection of an exculpatory clause.

The judgments dismissing the executors' objections to the accounts and allowing the accounts are affirmed.

*So ordered.*

---

[10] See Restatement (Second) of Trusts § 222(3) (1959); 3 Scott, Trusts § 222.4 (3d ed. 1967).